[No. B233877. Second Dist., Div. Seven. Oct. 17, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
QUAMIE BROWN, Defendant and Appellant.

## COUNSEL

John Alan Cohan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PERLUSS, P. J.**—Quamie Brown was convicted following a jury trial of two counts of assault with a deadly weapon. On appeal Brown contends the guilty verdicts for aggravated assault, as opposed to the lesser included offense of simple assault, are not supported by substantial evidence and the court committed prejudicial error in instructing the jury with the erroneous definition of "deadly weapon" contained in CALCRIM No. 875. Although we agree CALCRIM No. 875's definition of "deadly weapon," which includes objects that are inherently "dangerous" as well as inherently "deadly," is, at best, ambiguous and, at worst, overbroad, any instructional error was harmless, and Brown's two convictions are amply supported by the record. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Information*

Brown was charged in an amended information with six counts of assault with a deadly weapon, "to wit, [a] BB gun" (Pen. Code, § 245, subd. (a)(1)).[1] As to each count it was also specially alleged the offense was committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C)). Brown pleaded not guilty and denied the special gang allegation.

### 2. *The Trial*

Brown was tried along with codefendants Brian Eric Speight and Virgeon Leeton Mayberry. According to the evidence at trial, Gerardo Calderon and Jesus Castro were standing on the sidewalk near a parked car when Brown, accompanied by Speight and Mayberry, drove up alongside them in a white Cadillac and stopped the car approximately five feet from Calderon and Castro. Brown called Castro over to the car and through his open driver's side window said, "What the fuck you guys doing here? Get the fuck out of our neighborhood." Castro told Calderon, "Let's get out of here." At that moment Castro and Calderon saw Brown holding a black handgun. Castro shouted, "They're going to shoot at us," and the two men dove to the ground for cover. Calderon was hit in the foot with pellets from the BB gun. Castro was shot two times in the back. Although both Castro and Calderon had red welts on their bodies, neither man went to the hospital or sought medical attention for his injuries.

The People also presented evidence that, the day before Castro and Calderon were shot, three other people in the same neighborhood were shot with a BB gun by the driver of a white sedan. None of those victims (the

---

[1] At the time of the offenses charged and Brown's trial, Penal Code former section 245, subdivision (a)(1), provided, "Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not exceeding one year . . . ." (Stats. 2004, ch. 494, § 1, p. 4040.) Effective January 1, 2012 former subdivision (a)(1) of section 245 was divided into two separate and distinct subdivisions: section 245, subdivision (a)(1), now prohibits assault with a deadly weapon or instrument other than a firearm, and new subdivision (a)(4) prohibits assault by means of force likely to produce great bodily injury. (Stats. 2011, ch. 183, § 1.) According to the report of the Assembly Committee on Public Safety, the purpose of this change was to permit a more efficient assessment of a defendant's prior criminal history since an assault with a deadly weapon qualifies as a "serious felony" (see Pen. Code, § 1192.7, subd. (c)(1)), while an assault by force likely to produce great bodily injury does not. (See Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1026 (2011–2012 Reg. Sess.) as introduced Feb. 18, 2011.)

Statutory references are to the Penal Code.

subjects of the remaining counts) was able to identify Brown or his codefendants as the men in the white sedan.

Los Angeles Police Detective Eric Mendoza testified Brown was a member of the Black P-Stones criminal street gang and the shooting had occurred in territory claimed by the gang. Mendoza opined the shootings were committed for the benefit of, or in association with, a criminal street gang.

### 3.  *The Jury Instructions, Verdict and Sentence*

The jury was instructed on the elements of assault with a deadly weapon and on simple assault as a lesser included offense. Pursuant to CALCRIM No. 875, the jury was instructed a "deadly weapon" under section 245 is "any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury."

The jury found Brown guilty of two counts of assault with a deadly weapon on Castro and Calderon (counts 1 and 2) and found the gang enhancement allegation as to each of those counts true. The jury deadlocked on the remaining counts.

At sentencing the court struck the special gang enhancement allegation in the interest of justice (§§ 1385, 186.22, subd. (g)) and sentenced Brown to an aggregate state prison term of four years: three years for the aggravated assault on Castro, plus a consecutive one-year term (one-third the middle term) for the aggravated assault on Calderon. The court awarded Brown 256 days of presentence custody credit (171 days of actual custody credit plus 85 days of conduct credit).

## DISCUSSION

### 1.  *Governing Law on Assault with a Deadly Weapon*

■  "As used in section 245, subdivision (a)(1), a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' " (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028–1029 [68 Cal.Rptr.2d 655, 945 P.2d 1204] (*Aguilar*).) The Supreme Court has explained section 245 contemplates two categories of deadly weapons: In the first category are objects that are "deadly weapons as a matter of law" such as dirks and blackjacks because "the ordinary use for which they are designed establishes their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or

great bodily injury." (*Aguilar*, at p. 1029; accord, *In re David V.* (2010) 48 Cal.4th 23, 30, fn. 5 [104 Cal.Rptr.3d 471, 223 P.3d 603]; see *Aguilar*, at p. 1030 ["deadly weapons or instruments not inherently deadly are defined by their use in a manner capable of producing great bodily injury"].) For example, a bottle or a pencil, while not deadly per se, may be a deadly weapon within the meaning of section 245, subdivision (a)(1), when used in a manner capable of producing and likely to produce great bodily injury. (See, e.g., *People v. Zermeno* (1999) 21 Cal.4th 927, 931 [89 Cal.Rptr.2d 863, 986 P.2d 196] [beer bottle]; *People v. Page* (2004) 123 Cal.App.4th 1466, 1472 [20 Cal.Rptr.3d 857] [pencil].)

■ Great bodily injury, as used in section 245, means significant or substantial injury. (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1086 [130 Cal.Rptr.2d 717].) Because the statute speaks to the capability of inflicting significant injury, neither physical contact nor actual injury is required to support a conviction. (*Ibid.*) However, if injuries do result, the nature of such injuries and their location are relevant facts for consideration in determining whether an object was used in a manner capable of producing and likely to produce great bodily injury. (*Ibid.*; see *Aguilar, supra*, 16 Cal.4th at pp. 1028–1029; *People v. Russell* (1943) 59 Cal.App.2d 660, 665 [139 P.2d 661].)

2. *Substantial Evidence Supports the Jury's Finding Brown Committed Assault with a Deadly Weapon*

Brown contends the evidence was insufficient to support the jury's finding the BB gun used to shoot Calderon and Castro was a deadly weapon.[2] In particular, he asserts, there was no evidence presented as to the type of BB gun used, its operating speed or the extent to which the projectiles fired from it could penetrate muscle or tissue. (Cf. *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 541 [91 Cal.Rptr.2d 778] [sufficient evidence to support

---

[2] When considering challenges to the sufficiency of the evidence, we "review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 [75 Cal.Rptr.3d 289, 181 P.3d 105].)

finding BB gun was a deadly weapon under § 245 where expert testimony established BB gun could "expel pellets at speeds in excess of those required to penetrate a significant distance into muscle tissue or to enter an eyeball, and thus it was easily capable of inflicting significant injury"].) He further argues the relatively minor nature of the injuries suffered by Calderon and Castro—red welts on Calderon's foot and Castro's back—does not support a reasonable inference the weapon was either capable of causing great bodily injury or used in a manner capable of producing and likely to produce great bodily injury. (See, e.g., *People v. Beasley, supra,* 105 Cal.App.4th at p. 1088 [mild bruises on victim's shoulders and arms, without any evidence as to nature of broomstick and whether it was solid wood, plastic or some other material, insufficient to show Beasley wielded broomstick as a deadly weapon].)

■ Neither argument supports reversal on this ground. While it certainly would have been good practice for the People to have introduced evidence concerning the nature of the BB gun and its ability to inflict substantial injury (see, e.g., *People v. Lochtefeld, supra,* 77 Cal.App.4th at p. 540), such evidence is not essential to establish the deadly nature of the weapon (see *Aguilar, supra,* 16 Cal.4th at p. 1028 [deadly nature of weapon may be shown by any relevant factor]). Here, the evidence established Brown was, at most, five feet away from Calderon, and likely even closer to Castro, whom he had called over to his car, when he aimed the BB gun out the driver's side window and shot at them. Although the shots hit Calderon in the foot and Castro in the back, the jury could have reasonably inferred the location and severity of their injuries were fortuitous: Had Calderon and Castro not thrown themselves on the ground for cover, they just as easily could have been hit in the face, causing serious injury. Under these circumstances there is substantial evidence from which the jury could reasonably find a BB gun, when shot at close range in the manner indicated, was a deadly weapon under section 245, subdivision (a)(1).

   3.   *CALCRIM No. 875's Definition of "Deadly Weapon" Contains an Ambiguity That Might Lead to a Conviction on an Erroneous Legal Theory*

As discussed, CALCRIM No. 875 provides in part, "A deadly weapon is any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." In instructing the jury the court added to the language prescribed by the official CALCRIM instruction, "It is up to you to decide in this case if the BB gun at issue is or was a deadly or dangerous

weapon."[3] Brown contends the instruction was erroneous because it permitted the jury to find the BB gun a deadly weapon on any of three different theories: (1) the BB gun was an inherently deadly weapon; (2) the BB gun was an inherently dangerous weapon; or (3) the BB gun was used in a manner capable of causing and likely to cause great bodily injury. Because section 245, subdivision (a)(1), proscribes aggravated assaults with "a deadly weapon or instrument," unlike, for example, section 12022, subdivision (b), which expressly refers to the defendant's personal use of "a deadly or dangerous weapon in the commission of a felony or attempted felony,"[4] Brown argues only the first and the third theories of criminal liability are authorized by section 245. (See *Aguilar, supra*, 16 Cal.4th at pp. 1028–1029; *In re David V., supra*, 48 Cal.4th at p. 30, fn. 5.)[5] He appears to be correct.

Responding to Brown's challenge, the People insist CALCRIM No. 875 accurately states the definition of "deadly weapon" set forth in *Aguilar*, where the Supreme Court stated, "In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue." (*Aguilar, supra*, 16 Cal.4th at p. 1029.)[6] Emphasizing the court's use of the word "dangerous," the People argue *Aguilar* stands for the proposition an assault with either an inherently deadly or an inherently dangerous weapon, regardless of the manner of use, is an aggravated assault within the meaning of section 245, subdivision (a)(1). This argument, we believe, misreads *Aguilar*.

The issue before the court in *Aguilar* was whether hands and feet could constitute deadly weapons under section 245, subdivision (a)(1). Citing *People v. Graham* (1969) 71 Cal.2d 303 [78 Cal.Rptr. 217, 455 P.2d 153]

---

[3] In contrast to the court's oral instruction, this sentence in the printed instructions given to the jury simply read, "It is up to you to decide whether the BB gun used in this case is a 'deadly weapon.'"

[4] See sections 1192.7, subdivision (c)(23), defining as a "serious felony" "any felony in which the defendant personally used a dangerous or deadly weapon" and 667.61, subdivision (e)(3), specifying circumstances relevant to the application of the "One Strike" law to include the defendant's personal use of "a dangerous or deadly weapon or a firearm in the commission of the present offense."

[5] The People contend Brown has forfeited this challenge to CALCRIM No. 875 by failing to object in the trial court prior to jury deliberations. (He did raise the issue in a motion for new trial.) However, we review the merits of any claim of instructional error that allegedly affects a defendant's substantial rights, even in the absence of an objection. (§ 1259; *People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012 [44 Cal.Rptr.3d 632, 136 P.3d 168].)

[6] The Bench Notes to CALCRIM No. 875 cite *Aguilar, supra*, 16 Cal.4th at pages 1028 to 1029 for the definition of "deadly weapon."

(*Graham*),[7] the *Aguilar* court began its discussion by observing, as the court had in *Graham*, that there are two categories of deadly weapons: objects or instruments that by their intrinsic nature are deadly and those that are not necessarily or inevitably deadly, but can be deadly for purposes of section 245 if used in a particular manner. (*Aguilar, supra*, 16 Cal.4th at pp. 1028–1029.) The *Graham* court made this observation in the context of former section 211a, where it addressed whether sufficient evidence existed to support a finding the defendant was guilty of perpetrating a robbery while armed with a "dangerous or deadly weapon." (See Stats. 1961, ch. 1874, § 1, p. 3975 [repealed by Stats. 1986, ch. 1428, § 1, p. 5123].) Addressing a statute that expressly included "dangerous or deadly weapon" within its provisions, the *Graham* court identified two categories of "dangerous or deadly" weapons: Those weapons that, because of their intrinsic nature, were "dangerous or deadly" such as dirks and blackjacks, and those that were not per se deadly or dangerous but were used in a manner capable of inflicting and likely to inflict death or great bodily injury. (*Graham*, at pp. 327–328.)

In citing *Graham* for the proposition that deadly weapons fall into those distinctive categories, the *Aguilar* court did not consider, much less determine, that inherently dangerous weapons are either synonymous with, or are to be included as, deadly weapons under section 245 regardless of the manner in which they are used. (See generally *Santisas v. Goodin* (1998) 17 Cal.4th 599, 620 [71 Cal.Rptr.2d 830, 951 P.2d 399] ["[a]n appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided' "].) Nor, when the emphasized language is read in context, is the People's interpretation of *Aguilar* a fair reading of the opinion, particularly in light of other sections of the decision that omit the phrase "inherently dangerous weapon" entirely from the governing definition. (See *Aguilar, supra*, 16 Cal.4th at p. 1033 ["a 'deadly' weapon is one that is used in such a manner as to be capable of producing death or great bodily injury" (italics omitted)].) Rather, the court's invocation of the language in *Graham* appears to be simply a reiteration of *Graham*'s dual categories of deadly weapons, those that are intrinsically deadly and those that are used in a deadly manner.[8]

---

[7] *Graham* was disapproved on another ground in *People v. Ray* (1975) 14 Cal.3d 20, 32 [120 Cal.Rptr. 377, 533 P.2d 1017], which itself was overruled on yet another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 89 [96 Cal.Rptr.2d 451, 999 P.2d 675].

[8] In contrast to CALCRIM No. 875, CALJIC No. 9.02 , which also cites *Aguilar* for support of its definition of "deadly weapon," does not include the phrase "inherently deadly or dangerous" as part of its definition of "deadly weapon." (See CALJIC No. 9.02 [defining deadly weapon as an "object, instrument, or weapon which is used in such a manner as to be capable of producing, and likely to produce, death or great bodily injury"]; see also *id.*, com. par. 13 [noting the *Aguilar* court "reiterated the definition of deadly weapon found in this instruction for the crime of assault with a deadly weapon"].)

The People next suggest there is little meaningful difference between inherently deadly and inherently dangerous in this context. For the most part, they are correct.[9] Almost any weapon or instrument that can properly be described as inherently dangerous will also be inherently deadly; likewise, an item that is not inherently deadly will often not be inherently dangerous. However, in a narrow category of cases, such as one involving, perhaps, a paintball marker or a slingshot, the distinction could be critical. This potential significance was highlighted in *In re Bartholomew D.* (2005) 131 Cal.App.4th 317 [31 Cal.Rptr.3d 728], which, like the case at bar, involved the use of a BB gun. There, the juvenile court found Bartholomew D. had personally used a BB gun in committing a robbery, triggering an enhanced sentence under section 12022, subdivision (b), for a defendant who "personally uses a deadly or dangerous weapon in the commission of a felony." In upholding the juvenile court's finding the BB gun constituted a "deadly or dangerous" weapon, the *Bartholomew D.* court explained the relevant statute uses the words "dangerous or deadly" disjunctively. Accordingly, the court disregarded Bartholomew's argument there was insufficient evidence to find the BB gun a deadly weapon, emphasizing that, under section 12022, subdivision (b), " ' "it is not necessary to show that the weapon is deadly so long as it can be shown that it is dangerous." ' " (*Bartholomew D.*, at p. 322.) The court went on to conclude substantial evidence supported the finding that the BB gun was dangerous, even if not deadly, without considering the manner in which it was used.

In sum, CALCRIM No. 875 may impermissibly allow a jury to convict a defendant of assault with a deadly weapon if it finds the weapon employed was inherently dangerous, even if it rejects the notion that the instrument was inherently deadly or used in a manner capable of causing and likely to cause death or great bodily injury. That possibility, however theoretical it may be in most cases, should be obviated by an appropriate modification of the language in CALCRIM No. 875.[10]

### 4. *Any Instructional Error Was Harmless Beyond a Reasonable Doubt*

Relying on *People v. Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468] and *People v. Guiton* (1993) 4 Cal.4th 1116 [17 Cal.Rptr.2d 365,

---

[9] In rejecting a void-for-vagueness challenge to a probation condition prohibiting the possession of a dangerous or deadly weapon, our colleagues in Division Three of this court quoted Black's Law Dictionary's definition of "dangerous weapon" as " '[a]n object or device that, because of the way it is used, is capable of causing serious bodily injury.' " (*In re R.P.* (2009) 176 Cal.App.4th 562, 568 [97 Cal.Rptr.3d 822].) Under this definition there could be no such thing as an "inherently" dangerous weapon.

[10] Although not before us, at least one other CALCRIM instruction contains the same flawed definition of "deadly weapon." (See CALCRIM No. 3145.)

847 P.2d 45] (*Guiton*), Brown argues, because there is no basis to determine whether the jury relied on a legally incorrect theory to find him guilty of assault with a deadly weapon—the BB gun was inherently dangerous regardless of the manner in which it was actually used—his conviction must be reversed. In *Green* the California Supreme Court stated the general rule, "[W]hen the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand." (*Green*, at p. 69.) The *Green* court held this general rule required reversal of a conviction when the alternate theory is either legally erroneous—for example, based on inadmissible evidence or an improper instruction (*id.* at pp. 69–70)—or "when the defect in the alternate theory is not legal but factual, i.e., when the reviewing court holds the evidence insufficient to support the conviction on that ground" (*id.* at p. 70).

█ In *Guiton, supra*, 4 Cal.4th at pages 1122 to 1128, the California Supreme Court reviewed *Green* in light of the United States Supreme Court's then recent decision in *Griffin v. United States* (1991) 502 U.S. 46 [116 L.Ed.2d 371, 112 S.Ct. 466], which recognized, based on federal law, a distinction between legal error or a mistake of law, on the one hand, which is subject to the rule generally requiring reversal, and insufficiency of proof or a mistake concerning the weight or the factual import of the evidence, which does not require reversal when another valid basis for conviction exists. (*Griffin*, at p. 59.) The *Guiton* court harmonized *Green* and *Griffin* by observing the United States Supreme Court had "carefully distinguished between two types of cases involving insufficient evidence: (a) those in which 'a particular theory of conviction . . . is contrary to law,' or, phrased slightly differently, cases involving a '*legally* inadequate theory'; and (b) those in which the jury has merely been 'left the option of relying upon a *factually* inadequate theory,' or also phrased slightly differently, cases in which there was an 'insufficiency of proof.' [Citation.] The former type of case is subject to the rule generally requiring a reversal; the latter generally does not require reversal if at least one valid theory remains." (*Guiton*, at p. 1128.)

Although the general rule in cases involving a legally inadequate theory "has been to reverse the conviction because the appellate court is ' "unable to determine which of the prosecution's theories served as the basis for the jury's verdict" ' " (*Guiton, supra*, 4 Cal.4th at p. 1130), even this type of error can, in an appropriate case, be harmless: "If other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary [with respect to the element of the crime at issue], the erroneous . . . instruction [on that element] was harmless." (*People v. Chun* (2009) 45 Cal.4th 1172, 1205 [91 Cal.Rptr.3d 106, 203 P.3d 425]; see *People v. Harris* (1994) 9 Cal.4th 407, 424 [37 Cal.Rptr.2d 200, 886 P.2d 1193] [harmless

error test traditionally applied to misinstruction on the elements of an offense is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained' " (quoting *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]).) " 'To say that an error did not contribute to the verdict . . . is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " (*Harris*, at p. 430, italics omitted.)

As discussed, there was ample evidence at trial Brown used the BB gun in a manner capable of inflicting and likely to inflict great bodily injury. That evidence, as well as the arguments of counsel, leaves no reasonable doubt the jury found Brown guilty on this basis and not because it concluded the BB gun, regardless of the manner in which it was used, was "inherently dangerous." Indeed, the case was simply not tried on alternate grounds that included this legally inadequate theory, albeit one that is arguably possible under the current wording of CALCRIM No. 875.

Defense counsel in his closing argument emphasized the lack of any serious injury as a result of the shooting and urged the jury to return a guilty verdict only on the lesser included offense of simple assault. According to defense counsel, "The BB gun was not used in a way that could cause death or great bodily injury. The BB gun was fired from a distance of about 6 to 12 feet away from the people that were struck. It was fired in a manner that was low and away from the head of the people. . . . So, the critical question then in the case is whether shooting a BB gun at someone's leg or back is using a BB gun in such a way that is capable of causing or likely to cause death or great bodily injury." Defense counsel stated he agreed with the prosecutor's observation a BB gun could cause great bodily injury, but insisted, "The BB gun was not used in this case in that manner. It was not used in a way that was likely to cause great bodily injury. It was used in a way that would only cause minor or moderate harm . . . ."

In response the prosecutor did not contend the manner in which Brown used the BB gun was irrelevant. Rather, emphasizing defense counsel's concession the weapon would have caused serious injury if the victims had been hit in the eye or some other vulnerable spot on their bodies, he argued the only reasonable inference from the evidence presented was that Brown used the weapon in a manner that was likely to inflict great bodily injury. "All you have is evidence . . . Quamie Brown shot a BB gun at six different people and that, fortunately, none of them got harmed too seriously."

Considering the record as a whole and in light of all the instructions given, we are persuaded beyond any reasonable doubt the error in CALCRIM No. 875 was unimportant in relation to everything else the jury considered on

the issue in question. (Cf. *People v. Houston* (2012) 54 Cal.4th 1186, 1229 [144 Cal.Rptr.3d 716, 281 P.3d 799] ["[w]hen considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner"]; accord, *People v. Jablonski* (2006) 37 Cal.4th 774, 831 [38 Cal.Rptr.3d 98, 126 P.3d 938].)

## DISPOSITION

The judgment is affirmed.

Woods, J., and Zelon, J., concurred.