Filed 4/23/15  In re J.R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re J. R., a Person Coming Under the Juvenile Court Law. | C075593 |
| THE PEOPLE, | (Super. Ct. No. 68861) |
| Plaintiff and Respondent, | |
| v. | |
| J. R., | |
| Defendant and Appellant. | |

The minor J.R. appeals from an order committing him to juvenile detention, claiming the trial court (1) exceeded its jurisdiction in committing him to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ) because his offense, assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), is not listed as an eligible offense in Welfare and Institutions Code section 707, subdivision (b);[1] (2) abused its

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

discretion in ordering the commitment because it would not be a probable benefit to him and a less restrictive, effective, and appropriate alternative disposition existed; and (3) abused its discretion in ordering the maximum possible period of confinement. We disagree and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 2011 the minor was the subject of a wardship petition pursuant to section 602, subdivision (a) arising from an incident in which the minor had taken a knife from the kitchen at home and threatened to stab his stepbrother. In exchange for a dismissal of other counts, the minor admitted misdemeanor brandishing of a weapon (Pen. Code, § 417, subd. (a)) and was released to his father's and stepmother's custody under the supervision of a probation officer.

In May 2012 the minor admitted multiple violations of his probation. He was ordered to juvenile hall, and upon his release, he was committed to an electronic monitoring program and ordered to attend mental health counseling.

In July 2012 the minor was the subject of another wardship petition. He admitted certain allegations—misdemeanor criminal threat (Pen. Code, § 422), misdemeanor vandalism (Pen. Code, § 594, subd. (a)), and that prior dispositions had been ineffective in rehabilitating and protecting the minor (§ 726)—in exchange for a dismissal of other allegations. The minor's family was again the target of these crimes, and family members indicated they feared for their safety if the minor were to be released. Thus, the trial court committed the minor to the care, custody, and control of the probation department for placement in a foster home, private school, or group home.

In September 2012 the minor was placed in a group home in Tulare County. He was terminated from the program a month later for repeatedly absconding from the group home and for being arrested for petty theft. In December 2012 he was placed in a group home in Shasta County. While there, the minor repeatedly threatened staff at the home and set the yard on fire.

2

In March 2013 the minor, then 14 years old, was the subject of the instant wardship petition, filed in Shasta County, alleging the minor had violated Penal Code section 245, subdivision (a)(1) by committing felony assault with a deadly weapon or instrument other than a firearm by means of force likely to produce great bodily injury.[2] The minor admitted the allegation. He had "punched his group home staff member five to six times before stabbing him in the arm, the back of the shoulder, and in the side with a knife." The laceration to the staff member's arm severed a muscle and the nerves controlling one of his fingers. When asked if he intended to kill the victim, the minor said, "I guess, but my knife was not big enough to kill him." The matter was transferred to San Joaquin County for disposition.

Prior to the disposition hearing, at the trial court's request, a neuropsychologist evaluated the minor and opined that he needed to be placed in a "highly structured residential therapeutic program" that could manage his behavior and emotional problems resulting from his diagnosed bipolar disorder, conduct disorder, polysubstance dependence, and attention deficit hyperactivity disorder, as well as dependent, antisocial traits. If placed in a program offering rehabilitation and "intensive psychotherapeutic programs," the minor would be "more likely to conform his behavior, provided appropriate supervision and treatment is [*sic*] provided." But if placed in a different setting, there was a concern the minor would be exploited by "more sophisticated and delinquent minors," causing the minor's "criminally-oriented mentality" and "propensity for gang related conduct" to be enhanced.

---

[2] When the petition was filed, assault with a deadly weapon or instrument other than a firearm and assault by means of force likely to produce great bodily injury were codified separately in Penal Code section 245, subdivisions (a)(1) and (a)(4), respectively. The petition references only section 245, subdivision (a)(1); thus, assault by means of force likely to produce great bodily injury is not alleged in the instant petition.

3

The probation department contacted several in-state and out-of-state programs about the possibility of placement for the minor. These programs universally rejected the minor, citing his extreme assaultive behavior, use of deadly weapons, history of setting fires, and their determination that the minor required a secure juvenile justice setting. At the contested dispositional hearing, the minor's counsel suggested another out-of-state program that would be willing to take the minor, contingent on funding. The probation department contacted that program as well, noted that it is located on the grounds of a psychiatric hospital and provides extensive psychiatric services, but concluded that as the department had no history placing minors with that program, it was "unable to completely assess this program's unique statement that they are able to treat this minor when similar and even higher level programs are unable to safely accept this minor into their programs." The department was also concerned that transportation to and from the program would be unsecured, and that the facility itself would also be unsecured. Thus, the department did not recommend placement in that program.

Following argument of all parties and review of the numerous probation reports, psychological evaluation reports, and other documents presented by the parties, the trial court found the minor's mental health issues made his behavior erratic and unpredictable, causing him to need services offered in a highly structured, secure facility. The court also found that programs specifically designed to deal with minors with mental health needs and aggressive, delinquent behavior had rejected the minor, and that the program highlighted by minor's counsel was inappropriate because of overriding public safety concerns: the facility had failed to provide references, was unsecured, had not been used by the probation department previously, and would place the minor in direct contact with the program's low functioning and vulnerable clients. In addition, transportation to and from the facility would be unsecured. Thus, the trial court concluded that "commitment to DJJ is necessary because the minor's best interests require an environment providing firm, strict discipline for his out-of-control behavior evidenced by his participation in the

4

violent crime. Without such discipline and realignment of his social and moral structure, he poses a demonstrated threat to public safety."

The trial court additionally found, over the objection of the minor's counsel, that the minor's assault with a deadly weapon in violation of Penal Code section 245, subdivision (a)(1) rendered the minor eligible to be committed to DJJ because the offense was enumerated in section 707, subdivision (b). Therefore, the trial court committed the minor to DJJ and set the minor's maximum term of confinement at four years.

## DISCUSSION

### I

### Exercise of Jurisdiction

The minor contends the trial court lacked authority to commit him to DJJ because assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) is not a qualifying offense enumerated in section 707, subdivision (b). Section 707, subdivision (b) lists 30 qualifying offenses that give rise to a presumption that a minor 14 years of age or older is not a fit and proper subject to be dealt with under the juvenile court law. (See § 707, subd. (c); *In re Sim J.* (1995) 38 Cal.App.4th 94, 98.) Assault with a deadly weapon is not listed, and Penal Code section 245 is not referenced. (§ 707, subd. (b).) However, "[a]ssault by any means of force likely to produce great bodily injury" is enumerated, and this provision has been held to include assault with a deadly weapon. (§ 707, subd. (b)(14); see *In re Pedro C.* (1989) 215 Cal.App.3d 174, 182 (*Pedro C.*).) The minor acknowledges this holding but argues that in light of subsequent Supreme Court precedent (*People v. Aguilar* (1997) 16 Cal.4th 1023 (*Aguilar*)) and legislative amendment of Penal Code section 245 to divide assault with a deadly weapon and assault by means of force likely to produce great bodily injury into two separate and distinct subdivisions, *Pedro C.* is no longer good law. We disagree.

In *Pedro C.*, the minor was alleged to have committed assault with a deadly weapon

5

—a motor vehicle—upon a peace officer in violation of Penal Code section 245, former subdivision (b).[3] (*Pedro C.*, *supra*, 215 Cal.App.3d at p. 182.)  The minor admitted the allegation but disputed whether the alleged crime qualified him for commitment to what was then known as the California Youth Authority because the crime was not enumerated in section 707, subdivision (b).  (*Pedro C.*, at pp. 177, 182.)  The trial court initially concluded that because the minor was not charged with assault by any means of force likely to produce great bodily injury, he did not come within the ambit of section 707, subdivisions (b) and (c), but it later reconsidered the matter and reached the opposite conclusion.  (*Pedro C.*, at pp. 178-179.)  The Court of Appeal affirmed that decision, holding that in light of the statutory scheme underlying section 707, subdivision (b), to exclude assault with a deadly weapon merely because it is not specifically enumerated therein would "elevate form over substance."  (*Pedro C.*, at p. 182.)  For, " ' "[a] deadly weapon is one likely to produce death or great bodily injury." ' [Citations.]  Necessarily, then, assault with a deadly weapon includes assault by means likely to produce great bodily injury."  (*Ibid.*)  Therefore, the Court of Appeal concluded that assault with a deadly weapon "falls within the purview of section 707, subdivision (b) . . . ."  (*Pedro C.*, at p. 183.)

While the scope of the holding announced in *Pedro C.* may be overly broad in light of subsequent Supreme Court precedent and legislative amendment, we conclude it is still applicable in the instant case.  When *Pedro C.* was decided, assault with a deadly weapon and assault by means of force likely to produce great bodily injury were listed as alternatives in Penal Code section 245.  (*Pedro C.*, *supra*, 215 Cal.App.3d at p. 182.)  But

---

[3] Penal Code section 245, former subdivision (b) made it a crime to:  " 'commit[] an assault with a deadly weapon or instrument, other than a firearm, or by any means likely to produce great bodily injury upon the person of a peace officer . . . engaged in the performance of his or her duties . . . .' " (*Pedro C.*, *supra*, 215 Cal.App.3d at p. 182.)

by the time the instant petition was filed, the Legislature had divided these offenses into two separate and distinct subdivisions: assault with a deadly weapon or instrument other than a firearm (Pen. Code, § 245, subd. (a)(1)) and assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)). (Stats. 2011, ch. 183, § 1; *People v. Brown* (2012) 210 Cal.App.4th 1, 5, fn. 1 (*Brown*).)[4] These two subdivisions have different meanings and must be read as separate clauses to give full effect to the Legislature's intent. (*Aguilar*, *supra*, 16 Cal.4th at p. 1030.) This does not mean, however, that the two may not in some situations overlap such that section 707, subdivision (b)(14) encompasses both subdivisions for purposes of juvenile commitment.

In *Aguilar*, our Supreme Court explained that, for purposes of the aggravated assault statute, "deadly weapon or instrument" does not encompass hands or feet, but only those objects extrinsic to the body. (*Aguilar*, *supra*, 16 Cal.4th at p. 1030.) To hold otherwise would render the alternative "force likely to produce great bodily injury" language redundant because "deadly weapons or instruments not inherently deadly are defined by their use in a manner capable of producing great bodily injury." (*Ibid.*) If hands or feet could be construed as deadly weapons, the "force likely" language would be unnecessary. (*Ibid.*) Thus, the court inferred that the presence of both alternatives indicated a legislative intent that there be a meaningful difference between the two alternatives. (*Ibid.*)

The *Aguilar* court concluded that " '[a] deadly weapon is any object, instrument, or weapon which is used in such a manner as to be capable of producing, and likely to produce, death or great bodily injury[,]' " whereas the "force likely" phrase also

---

[4] The stated purpose of this amendment was to permit a more efficient assessment of a defendant's prior criminal history because assault with a deadly weapon qualifies as a serious felony under Penal Code section 1192.7, subdivision (c)(1), while assault by force likely to produce great bodily injury does not. (*Brown*, *supra*, 210 Cal.App.4th at p. 5, fn. 1.)

7

encompasses hands and feet used in such a manner as to be capable of producing, and likely to produce, great bodily injury. (*Aguilar*, *supra*, 16 Cal.4th at p. 1037.) However, this holding does not "reduce the [deadly weapon] clause to surplusage. There remain assaults involving weapons that are deadly per se, such as dirks and blackjacks, in which the prosecutor may argue for, and the jury convict of, aggravated assault based on the mere character of the weapon." (*Id.* at p. 1037, fn. 10.) But, if the weapon is not deadly per se, it may be encompassed within the "force likely" language.

The minor does not dispute *Aguilar* but contends, without citation to any authority, that the knife the minor used was deadly per se and therefore his assault may not be encompassed within section 707, subdivision (b)(14). Contrary to the minor's assertion, a knife is not deadly per se. (See *People v. McCoy* (1944) 25 Cal.2d 177, 188 ["a knife is not an inherently dangerous or deadly instrument as a matter of law"]; see also *People v. Burton* (2006) 143 Cal.App.4th 447, 457.) The petition expressly alleged the minor committed an assault with a deadly weapon and that the weapon was a knife, and the minor admitted those allegations. As noted above, a weapon that is not deadly per se becomes a deadly weapon when it is used in a manner capable of producing great bodily injury (see *Aguilar*, *supra*, 16 Cal.4th at p.1030), and assault necessarily involves the unlawful attempt and present ability to apply physical force (*People v. Wright* (1996) 52 Cal.App.4th 203, 209). Thus, where the application of physical force is committed with a deadly weapon, the resultant assault with a deadly weapon is necessarily subsumed into the general category of "[a]ssault by any means of force likely to produce great bodily injury" described in section 707, subdivision (b)(14). Accordingly, the trial court did not exceed its jurisdiction in concluding the minor could be committed to DJJ pursuant to section 707, subdivision (b).

8

## II

## Commitment to DJJ

The minor contends the trial court abused its discretion in committing him to DJJ because the commitment would not be a probable benefit to the minor and because a less restrictive, effective, and appropriate alternative disposition existed. We find no error.

" 'The decision of the juvenile court may be reversed on appeal only upon a showing that the court abused its discretion in committing a minor to [DJJ].' [Citation.] 'An appellate court will not lightly substitute its decision for that rendered by the juvenile court.' [Citation.] An appellate court 'must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them. [Citations.]' [Citation.] 'In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law. . . .' [Citation.]" (*In re Jose T.* (2010) 191 Cal.App.4th 1142, 1147; see *In re Michael D.* (1987) 188 Cal.App.3d 1392, 1395.)

These purposes include (1) "the protection and safety of the public" (§ 202, subd. (a)) and (2) "care, treatment, and guidance that is consistent with [the minor's] best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances[, which] may include punishment that is consistent with the rehabilitative objectives of [the juvenile court law]" (§ 202, subd. (b)). However, "[n]o ward of the juvenile court shall be committed to the [DJJ] unless the judge of the court is fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided by the [DJJ]." (§ 734.) Thus, in determining disposition, "the court shall consider, in addition to other relevant and material evidence, (1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history." (§ 725.5.)

9

Here, the trial court found that placement of the minor in the out-of-state program was "inappropriate for the minor because of his [*sic*] overriding public safety concerns." The court also ordered "the commitment to DJJ is necessary because the minor's best interests require an environment providing firm, strict discipline for his out-of-control behavior evidenced by his participation in the violent crime [the felony assault with a deadly weapon]. Without such discipline and realignment of his social and moral structure, he poses a demonstrated threat to public safety."

Though the minor was relatively young, 14 years old, when he assaulted the group home staff member, the severity of the minor's attack on the victim, his significant mental health issues, and his substantial previous delinquent history support the trial court's order committing him to DJJ, both for the minor's benefit and to protect public safety. The minor had failed multiple prior placements, both in his parents' home and in group homes. He repeatedly threatened to harm family members to the point that they feared having him at home, he ran away from group homes, he threatened and attacked staff at the most recent home, and he set a fire at the most recent group home. His behavior was erratic and unpredictable due to his diagnosed mental health issues, he was proud of his violent antisocial behavior, and he demonstrated no remorse for his crimes. He had been deemed a high risk to reoffend. There was no dispute he was in need of therapeutic mental health treatment in a highly structured setting, but after a diligent search on the part of the probation department, no such setting was located that was willing to accept the minor for placement. And the probation department was unwilling to recommend placement at the unsecured out-of-state facility proposed by the minor because of safety concerns.

These facts were considered by the court and constitute substantial evidence to support the trial court's determination that the minor and the public would be best served if the minor were to be committed to DJJ. Accordingly, the trial court did not abuse its discretion in committing the minor to DJJ.

### III

### Maximum Period of Confinement

The minor also contends the trial court abused its discretion in electing the maximum possible period of confinement for the minor. In selecting the maximum period of confinement to DJJ, the trial court must consider the facts and circumstances of the case, and then must select a term that may not be more than that for a comparable adult, but may be less. (§ 731, subd. (c); *In re Carlos E.* (2005) 127 Cal.App.4th 1529, 1542.) Here, the trial court selected the maximum confinement time of four years "based on all the circumstances and facts of this particular case."

The minor's limited briefing on this issue argues, without further analysis, that in light of the minor's alleged "minimal criminal history" and lack of signs that he is "the type of violent, sophisticated juvenile offender who should be committed to DJJ," the trial court abused its discretion in setting the maximum possible period of confinement at four years. In light of this perfunctory showing by the minor, we decline to reweigh the evidence and find no abuse of discretion was committed by the trial court in selecting the maximum period of confinement.

### DISPOSITION

The judgment (order of commitment) is affirmed.

                                             _____RAYE_____, P. J.

We concur:

_____BLEASE_____, J.

_____ROBIE_____, J.