Filed 9/30/15  P. v. Tapia CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B262350 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA103823) |
| v. | |
| DAVID TAPIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  George Genesta, Judge.  Affirmed.

———

The Defenders Law Group and Carlos J. Perez for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson, and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

———

Defendant David Tapia assaulted his former stepfather with a pocket knife. A jury convicted him of assault with a deadly weapon and inflicting injury on an elder. He contends that the evidence was insufficient to support the jury's finding that the pocket knife was a deadly weapon. He also contends that the trial court abused its discretion by imposing the upper term for the conviction of inflicting injury on an elder. We reject both arguments and affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

Jesus Vargas Gallegos is defendant's former stepfather. He and defendant's mother, Delores Otero, divorced in approximately 2009. Thereafter, a dispute arose between them concerning the proceeds from the sale of a house; Gallegos believed Otero owed him $50,000. Gallegos told defendant he wanted the money.

On November 23, 2013, at approximately 11:00 p.m., the 77-year-old Gallegos was asleep on a sofa in his living room. Although he shared the house with four others, only his 14-year-old grandson, Marc Deleon, was home at the time. Defendant, who lived about one or two miles away, entered the house through an unlocked door. He smelled of alcohol and appeared to be intoxicated. He had a cast on one leg.

Defendant woke Gallegos and began hitting him with his fists. He pulled out a pocket knife and poked and stabbed Gallegos in his chest, shoulder, and arms. The knife blade was between two and three inches long. As he attacked Gallegos, defendant said he was going to beat or kill him so that Gallegos would stop asking Otero for money. Deleon watched the attack from his bedroom through an opening in the doorway.

Defendant dragged Gallegos about six feet from the sofa to the bathroom, then "dumped" or "threw" him into the bathtub. He repeated his threat to kill Gallegos. He banged Gallegos's head against the bathtub three or four times, causing Gallegos to lose consciousness. He continued to punch Gallegos and stab him with the knife.

After defendant left, Deleon called his father. The father arrived home about 15 or 20 minutes later and called the police. A responding police officer observed that Gallegos was disoriented and "covered in blood." Gallegos had "some gashes" on his

2

right arm. A trail of blood ran from the living room to the bathroom, and the bathtub and sink were splattered with blood.

After interviewing Gallegos and Deleon, police officers arrested defendant at his home. He smelled of alcohol. Although he had a cast on his leg and walked with a limp, he was able to walk from the house to the police car without a crutch.

Gallegos suffered a broken nose and injuries to his head and chest, including multiple stab wounds to his arm, armpit, and shoulder. Although he went to the hospital, his wounds did not require stitches or surgery.

At some point after the attack, Gallegos told defendant's former girlfriend, Lorena Hernandez, he would "drop the charges" if Otero would give him $10,000 for his "part from the house."

Hernandez testified for the defense. She said that at the time of the incident, defendant could not walk without assistance because of the cast on his leg, which extended from his foot to his thigh. She also testified that she and defendant were together on the night of the incident; she gave him pain medication and helped him to bed, then walked home around 11:00 or 11:30 p.m.

A jury convicted defendant of assault with a deadly weapon (Count 2; Pen. Code, § 245, subd. (a)(1)[1] and inflicting great bodily harm on an elder (Count 3; § 368, subd. (b)(1)).[2] The jury found true allegations that defendant inflicted great bodily injury on a victim at least 70 years old (§ 12022.7, subd. (c)) and, in connection with Count 3, that defendant used a deadly and dangerous weapon and caused the victim to suffer great bodily injury (§§ 368, subd. (b)(2), 12022, subd. (b)(1)). The court imposed a sentence of 10 years in prison based in part upon its selection of the upper term for Count 3.

---

[1]    All subsequent statutory references are to the Penal Code unless otherwise indicated.

[2]    The jury could not reach a verdict on a charge of attempted murder. The court declared a mistrial as to that count and later granted the People's motion to dismiss the charge.

3

**DISCUSSION**

1.      *Sufficiency of the Evidence of a Deadly Weapon*

Defendant contends that the evidence is insufficient to support the jury's finding that he committed the assault with a deadly weapon. We disagree.

Section 245, subdivision (a)(1), makes unlawful "an assault upon the person of another with a deadly weapon or instrument other than a firearm." A deadly weapon "is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citations.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury. In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue." (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029.) Such other facts include the nature and location of any injuries. (*People v. Brown* (2012) 210 Cal.App.4th 1, 7.)

Here, Gallegos and Deleon described the pocket knife as having a two or three inch blade. Defendant used the knife in a dangerous and threatening manner. According to Gallegos, defendant poked and cut him in his upper chest, shoulder, and arms. Deleon indicated that defendant used a forward thrusting motion to poke and stab Gallegos, and that Gallegos had to use his arms to block stabs to his chest. During the attack, defendant told Gallegos he was going to kill him. The jury saw photographs of the stab wounds, which we have reviewed. The photographs show that at least some of the cuts broke Gallegos's skin and drew blood. Although defendant did not cut Gallegos deep enough to require stitches, the evidence that he used a knife repeatedly to poke and stab Gallegos

4

while threatening to kill him provides sufficient evidence to support the jury's deadly weapon finding.[3]

### 2. *The Trial Court's Selection of the Upper Term*

Defendant contends that the court abused its discretion when it selected the upper term for the conviction of inflicting injury on an elder. We disagree.

### A. *The Sentencing Hearing*

The probation department recommended that defendant be sentenced to the upper term based on six aggravating factors and the absence of any mitigating factors. At the outset of the sentencing hearing, the court stated it had read the probation report and indicated it would select the upper term of four years for the conviction of inflicting injury on an elder. The court identified the following aggravating factors: (1) the crime was carried out in a manner that indicated planning, sophistication, and professionalism; (2) defendant has had numerous and increasingly serious prior convictions; (3) defendant has served a prior prison term; and (4) defendant's prior performance on probation or parole was unsatisfactory.[4] The court found no mitigating factors.

Defendant moved to "reconsider" or strike the jury's findings as to great bodily injury and the use of a deadly weapon. Defendant also requested that the court suspend his sentence and give him probation or, alternatively, select the low term. His counsel argued that defendant "has learned his lesson while he's been in custody" and "is now a man of faith." He submitted letters of recommendation from the Sheriff's Department Merit Program, the Salvation Army, and the Five Keys Charter Program. The defendant spoke to the court and stated that he has "done wrong in [his] life" and "apologize[d] for [his] mistakes." He attested to his recent "spiritual growth."

---

[3] The jury heard and saw evidence of blood on the floor, sink, and bathtub. The record does not disclose, however, whether the blood was the result of the wounds inflicted by defendant's knife or his fists. We do not, therefore, rely upon the blood evidence to support the jury's deadly weapon finding.

[4] The court did not expressly rely on the following additional aggravating factors cited by the probation department: (1) the victim was particularly vulnerable; and (2) the defendant took advantage of a position of trust or confidence to commit the offense.

The court denied defendant's motion and request, explaining: "The evidence was clear that the defendant entered the residence. The victim was sleeping, immediately began pummeling him, kicking him, beating him with fists and kicks, dragged him into the bathroom where he then slammed his head into the porcelain bathtub numerous times and had a pocketknife and stabbed him and created lacerations about his forearms. The victim lost consciousness, and the victim is a person over the age of 70." The court then addressed defendant directly: "This was no mistake. This was a vicious, intended attack based upon a family dispute between your mother and her former husband over the disposition of a property, and you decided to take matters into your own hands. It was an attack that was by surprise. It was an attack of a completely vulnerable person."

In addition to the upper term of four years for the conviction of inflicting injury on an elder, the court added five years to the sentence based on the jury's finding that defendant inflicted great bodily injury on a victim at least 70 years old, and one year based on the jury's finding that defendant personally used a deadly and dangerous weapon. The court also imposed and stayed pursuant to section 654 a one-year sentence for the conviction for assault with a deadly weapon. The court imposed a total term of 10 years.

B. *Discussion*

Defendant was convicted of inflicting injury upon an elder in violation of section 368, subdivision (b)(1). That statute specifies three possible sentences: "two, three, or four years." Under the determinate sentencing law, "the choice of the appropriate term shall rest within the sound discretion of the court. . . . In determining the appropriate term, the court may consider the record in the case, the probation officer's report, other reports, . . . and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, or the family of the victim if the victim is deceased, and any further evidence introduced at the sentencing hearing. The court shall select the term which, in the court's discretion, best serves the interests of justice." (§ 1170, subd. (b).) We review the court's choice of term for an abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

6

The court did not err. It considered the probation report and found true four of the six aggravating factors identified by the probation department. Defendant does not challenge the sufficiency of the evidence supporting these factors. Instead, he argues that Gallegos "suffered only minor wounds, nothing severe, [and] cuts that did not require surgery." The record, however, indicates that Gallegos's injuries were more serious than he asserts. Although Gallegos did not require surgery, his treating physician testified that Gallegos suffered a "direct crack" in the bridge of his nose that "crushed" his bones. Moreover, the physician considered Gallegos's condition "serious" because he had been rendered unconscious. Gallegos testified that he continued to suffer headaches "for a long time," and that injuries to his nose and the left side of his face, near his temple, had not fully healed by the time of trial – one year after the incident.

Defendant further asserts that the weapon "was only a pocket knife, a small one." Just as the jury could reasonably conclude that the knife was a deadly weapon, so could the court in sentencing. Finally, defendant points to the letters he offered in mitigation. The letters indicate that Tapia, while in jail: (1) has been voluntarily participating in an educational program under the auspices of the Los Angeles County Sheriff's Department; (2) has been participating in a Salvation Army school of ministry; (3) has enrolled in a school of ministry with the Los Angeles County Sheriff's Department; and (4) has received "good" and "excellent" marks for his work in the Five Keys Charter School.[5] Notwithstanding these reports, the court could reasonably find that the aggravating factors outweighed the positive letters.

---

[5] These letters were not initially included in the record on appeal. On our own motion, we augmented the record to include them. (Cal. Rules of Court, rule 8.340(c).)

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

LUI, J.

MOOR, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.