Filed 7/14/15  P. v. Neal CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059220 |
| v. | (Super.Ct.No. SWF1103043) |
| MARK KEVIN NEAL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Edward D. Webster, Judge.  (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part, reversed in part, and remanded with directions.

Susan L. Ferguson, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, and Peter Quon and Stacy Tyler, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Mark Kevin Neal followed his girlfriend around from bar to bar, even though she told him to leave her alone. He cursed out a man he saw hugging her. Later that night, he went to her house. She was not there, but her roommate and her roommate's boyfriend were. Defendant kicked in the door, broke a laptop computer, and beat up the roommate's boyfriend.

A jury found defendant guilty of first degree burglary. (Pen. Code, §§ 459, 460, subd. (a).) It also found him guilty of simple battery (Pen. Code, § 242), as a lesser included offense of battery causing serious bodily injury (Pen. Code, § 243, subd. (d)). He was sentenced to a total of two years in prison, along with the usual fines and fees.

Defendant now contends:

1. There was insufficient evidence that, when defendant entered the house, he intended to commit a felony.

2. The trial court erred by admitting evidence of an uncharged act of domestic violence because none of the charged crimes involved domestic violence.

3. Defense counsel rendered ineffective assistance by failing to object to prosecutorial error in closing argument.

We will hold that the prosecutor did misstate the law in closing argument and that defense counsel rendered prejudicially ineffective assistance by failing to object. Accordingly, we must reverse the burglary conviction. However, we will also hold that

there was sufficient evidence that defendant intended to commit a felony; hence, a retrial of the burglary charge is not barred by double jeopardy. Finally, we will hold that the charged burglary was a crime of domestic violence, so that prior acts of domestic violence were admissible under Evidence Code section 1109. We will affirm the simple battery conviction.

## I

## FACTUAL BACKGROUND

A.    *The Prosecution Case*.

Michelle Lee and Stephanie Lee were roommates; they shared a house in Murrieta. (Because the two women had the same last name, we will use their first names for the sake of clarity.) Defendant was Michelle's boyfriend. Stephanie's boyfriend was Marine Staff Sergeant Andrew Berryman.

On November 17, 2011, defendant "scolded" one of Michelle's daughters in a way that she considered "unacceptable." The next day, Michelle's daughter told her that she was afraid of defendant. At that point, Michelle decided to break up with defendant. However, she wanted to do it "slowly because of his anger."

On November 18, Michelle told defendant she was going out with friends. She said she did not want to be with him that night.

Michelle and her friends — including Stephanie and Berryman — went to a bar called the Bank. Defendant kept texting her, asking her where she was, what she was doing, and whom she was with. She told him, "Leave me alone for the night."

3

Defendant then showed up at the Bank. Michelle told him she did not want him there. Berryman and defendant "bought each other a couple of drinks" and had a friendly conversation. Defendant had a total of six or seven drinks while at the Bank.

When Michelle and her friends went across the street to a bar called the Public House, defendant followed them. Michelle's friend Marco Souther was already there; she hugged him.[1] Defendant "wasn't happy" about the hug; he initiated an exchange of "foul language" with Souther. Michelle got in between them and told defendant to leave. Defendant, however, "just kept staying."

Stephanie and Berryman were the first to leave; they went back to the house. After that, defendant left. However, between 11:22 p.m. and 12:51 a.m., he phoned or texted Michelle over 20 times. Finally, around 1:00 a.m., Michelle and Souther left; they went to Souther's house.

Defendant left Michelle one voicemail saying: "You're in the house right now. I don't know what you're doing, but I'm here. I'm at your house. It's late and it's dark and cold, so, um, I'm here. Not sure what the fuck you're doing right now. Call me. Call me back. Bye."

He also left her another voicemail saying: "Michelle — I am in front of your fucking house right now. I don't know what the fuck you're doing. I am here. I don't know — what the hell? Please call me. What the fuck, man?"

---

[1] Souther and Michelle had dated "a little bit" in the past, but defendant did not know that.

4

Defendant kicked down Michelle's front door and went inside. In her bedroom, he broke her laptop computer in half, ripping the screen away from the keyboard, and left it on the floor.

Stephanie was asleep in her own bedroom. Berryman was outside on the back patio, sitting down and smoking. He first realized defendant was there when defendant came out through the patio door. Berryman said, in a friendly manner, "Mark, what are you doing here?"

Defendant punched Berryman in the face, knocking him out of the chair and onto the ground. He continued to hit Berryman in the head and shoulders. Berryman managed to kick defendant away long enough to get to his feet. He said, "Mark, what the hell is going on right now?"

According to Berryman, defendant "snapped[] to[]."[2] Defendant accused Berryman of knowing where Michelle was. Berryman said, "This is insane right now. Do you think maybe this is why she wouldn't be with you?" Defendant then punched Berryman in the face again. Berryman fell to the ground, on his back, and defendant started choking him. Berryman tapped defendant's arm, as a signal of surrender, but defendant just laughed and said, "You think I'm going to stop?" The choking lasted 15 to

---

[2] Berryman's complete sentence, according to the reporter's transcript, was: "[I]t was almost like he snapped, too." Defendant reads this as "snapped to," meaning "snapped to attention" or "snapped out of it." Given Berryman's further testimony that defendant then stopped punching him and started talking to him, we agree with this interpretation. Certainly the jury could reasonably understand it this way.

5

20 seconds; Berryman could not breathe. Finally, he managed to throw defendant off of him.

Again, according to Berryman, defendant "snapped[] to[]. Like he stopped, and he took a step back, and said, 'What the hell am I doing?'" Berryman talked to him and tried to calm him down. Finally, defendant said, "I have a cab waiting right now. I'm going to go." He left in the waiting cab.

Berryman woke Stephanie, and she called 911. Berryman was taken to a hospital. His medical records were introduced into evidence. Although they have not been transmitted to us (see Cal. Rules of Court, rules 8.122(a)(3), 8.224(a)), apparently they said that he had a head injury with a concussion, but the head injury did not appear serious. His face remained swollen for about a month. His left eye "was filled up with blood" and stayed that way for several months.

The prosecution also introduced evidence that defendant had committed uncharged domestic violence. (See part IV, *post*.)

B. *The Defense Case*.

Defendant testified on his own behalf.

According to defendant, on November 18, 2011, Michelle told him, "I would like to go spend a couple of hours with my girlfriend at [t]he Bank . . . I'll call you when I'm done, and we can meet up afterwards."

Accordingly, around 9:30 p.m., defendant went to the Bank and joined Michelle's group. She was "distant"; defendant started to feel "[t]here was a dynamic going on that [he] wasn't aware of." However, she never said she did not want him there.

Defendant walked over to the Public House in company with Michelle, Stephanie, and Berryman. As they were going in, defendant "bumped shoulders" with Souther, and they told each other, "Hey, watch out."

Michelle "gravitat[ed]" toward Souther. Defendant did not know who Souther was. Michelle's "body language" indicated that she wanted defendant to leave her alone. He "tr[ied] to steer clear and observe." He had "[m]aybe two" more drinks at the Public House.

Defendant was "enjoying the music" when he glanced over and realized that Michelle and her friends were gone. He tried to phone her and text her. When that failed, he took a cab to her house. He "figured" everybody had gone back to her house, to "continue our party . . . ."[3]

When he got there, the house was dark. He knocked on the door. He also tried to phone Michelle. He then called a cab.

---

[3] On cross-examination, however, defendant admitted that Michelle "made it very clear that night that she did not want to see [him] anymore[.]"

Defendant admitted kicking in the door, but only because he was "frustrated and confused" and because he was cold. At that moment, he did not intend to do anything in particular inside the house. He thought no one was home.[4]

Defendant also admitted punching Berryman, because he was frustrated and because he believed that Berryman was lying "[a]bout where Michelle was and who she was with."

Finally, defendant admitted breaking the laptop, but only by accident: "I thought maybe [Michelle] was asleep . . . . And when I pulled [the sheets] back, the laptop, which I didn't even see, was on the bed, and it just kind of fell over on to the floor."

II

INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT

TO THE PROSECUTOR'S MISSTATEMENT OF THE LAW

Defendant contends that defense counsel rendered ineffective assistance by failing to object to prosecutorial misconduct in closing argument.

A. *Additional Factual and Procedural Background.*

In her rebuttal closing argument, the prosecutor stated:

"I want to talk just briefly about the voluntary intoxication. . . . It's not a defense at all to . . . battery causing serious bodily injury. The fact that he was intoxicated at the

---

[4] Defendant told police, however, that he knew Stephanie and Berryman were home because he saw them through the window.

time is not a defense. What you can consider his intoxication level for is whether it prevented him from forming the intent to enter the house to commit an assault.

"And here's why voluntary intoxication doesn't apply. Let's take a scenario where a defendant is at a bar drinking, gets intoxicated. Leaves the bar. Mistakenly believes he's getting into his vehicle. It looks like his vehicle. It's open. So gets into the car, and let's say in this hypothetical he drives away; right? He could be not guilty of stealing a car, because in his drunken mind he thought the car was his. That is a whole lot different than that same man getting drunk in a bar coming outside and saying, 'Man, I'm wasted, and I don't really feel like waiting for a cab. So I'm going to steal this car and take it home. And I'm not in my right mind, but I have liquid courage, and I'm fueled by alcohol to do this.' . . .

"The defendant didn't go into Michelle Lee's house mistakenly believing that it was his, or under some mistaken belief because he was intoxicated. We know that he was — at least had his wits about him to talk to the police officer in a coherent manner. You can understand what he's saying on the voicemails. All the alcohol did for him that night was give him maybe the courage or the lack of sense to do what he did. But it didn't prevent him from forming the intent to commit an assault. It probably actually fueled it is what happened."

Defense counsel did not object.

B.    *Analysis*.

"'[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.  A more apt description of the transgression is prosecutorial error.' [Citation.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

"'""A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.]  When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant's claims are, '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."' [Citation.]  To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. [Citation.]" [Citation.]  A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm.' [Citation.]" (*People v. Adams* (2014) 60 Cal.4th 541, 568-569.)

"[I]t is misconduct for a prosecutor, during argument, to misstate the law [citation] . . . ." (*People v. Whalen* (2013) 56 Cal.4th 1, 77.)  Defendant claims the prosecutor

10

erroneously equated two distinct defenses:[5] (1) voluntary intoxication that prevents the formation of a specific intent and (2) mistake of fact. Thus, she told the jury that voluntary intoxication could not be a defense unless it resulted in a mistake of fact.

Preliminarily, defense counsel forfeited the claimed misconduct by failing to object. Defendant does not claim that any exception to the rule of forfeiture applies. Defendant does argue that we have discretion to reach the issue, despite the forfeiture. However, we see nothing unusual about this case so as to call for the exercise of that discretion. Thus, the only question properly presented is whether defense counsel rendered ineffective assistance by failing to object.

"When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an

---

[5] In this discussion, we use "defense" loosely to mean any theory that negates guilt, whether it disproves an element of the prosecution's case or it proves an affirmative defense.

11

*appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Here, the prosecutor did indeed misstate the law. Basically, she asserted that voluntary intoxication was not a defense unless it caused defendant to be under a mistake of fact. However, mistake of fact is a defense without regard to whether it is the result of voluntary intoxication. (Pen. Code, § 26, subd. Three.) Contrariwise, voluntary intoxication that prevents the formation of a specific intent is a defense without regard to whether it results in a mistake of fact. (Pen. Code, § 29.4, subd. (b).) In some instances, these defenses may overlap, as in the prosecutor's example of an intoxicated person who mistakenly drives the wrong car. Nevertheless, they are independent.

For example, in *People v. Hughes* (2002) 27 Cal.4th 287, the defendant was charged with murder, burglary, robbery, and forcible sodomy. (*Id*. at p. 315.) There was evidence that, at the time of the alleged crimes, he was under the influence of cocaine and alcohol. (*Id*. at pp. 315, 321.) There was expert testimony that "the combination of drugs and alcohol ingested by defendant likely caused 'significant impairment' of defendant's mental abilities at the time of the charged crimes." (*Id*. at p. 323.) An instruction on the sodomy charge stated, "' . . . no act committed by a person while in a state of voluntary

intoxication is less criminal by reason of his having been in such a condition.'" (*Id*. at p. 340, italics omitted.) However, the trial court also instructed that, with respect to the murder, burglary, and robbery charges, "[i]f the evidence shows that the Defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether the Defendant had [any necessary] specific intent and/or mental state." (*Id*. at p. 340, italics omitted.)

The Supreme Court characterized voluntary intoxication as "the centerpiece of [the] defense." (*People v. Hughes*, *supra*, 27 Cal.4th at p. 341.) It concluded, however, that even assuming the "no act" instruction was "potentially misleading," in light of the evidence, instructions, and argument, taken as a whole, it was not reasonably likely that the jury misunderstood it as meaning that the evidence of voluntary intoxication was irrelevant to the murder, burglary, and sodomy charges. (*Ibid*.) In sum, then, the court endorsed voluntary intoxication that prevents the formation of specific intent as a defense, even though there was no evidence of any particular mistake of fact.

We cannot imagine a rational tactical reason for defense counsel's failure to object. Defense counsel had requested a voluntary intoxication instruction. In his closing argument, he had called the jury's attention to the instruction and argued: "You can consider voluntary intoxication. Was he able to form the specific intent to commit an assault by means of force likely to cause great bodily injury? If you don't have that feeling, if you don't believe that beyond a reasonable doubt as the instruction says, you must find him not guilty." Because the prosecutor made her remarks in her rebuttal

13

argument, defense counsel could not counter them by responding to them in his own closing. The only reasonable thing to do was to object and to request an admonition.

Finally, it is reasonably probable that, if defense counsel had objected and requested an admonition, the verdict would have been more favorable to defendant. As already noted, defense counsel was relying on voluntary intoxication as a defense. There was ample evidence that defendant was heavily intoxicated. In addition, there was evidence that, due to his intoxication, he was not really planning or thinking things through. He called a cab before kicking down the door; this seems inconsistent with a plan to assault someone inside. He could not be sure Michelle was even home. His assault on Berryman seems to have been rash and unconsidered, as shown by the way he "snapped[] to[]" from time to time. At one point, defendant even said, "'What the hell am I doing?'" Finally, defendant testified himself that he kicked down the door only because he was cold, frustrated, and confused, and he had no particular idea of what he was going to do inside.

Conversely, the evidence that defendant already intended to commit an assault when he entered was weak, at best. As we will discuss in part III, *ante*, the jury was *allowed* to infer, from the fact that he ultimately did commit an assault, that he entered with the intent to commit an assault. However, it was not *required* to draw this inference; moreover, other evidence contradicted it. Arguably, kicking in the door and breaking the laptop were some evidence of an intent to commit violent acts, but they were perfectly

14

consistent with a "Hulk smash" state of mind in which he did not prevision any particular violent act.

The prosecutor's misstatement of law — that voluntary intoxication was not a defense because it did not cause defendant to be under a mistake of fact — tended to prevent the jury from giving this evidence due consideration.

We acknowledge that "'[w]hen argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." [Citation.]' [Citation.]" (*People v. Centeno*, *supra*, 60 Cal.4th at p. 676.) The jury was instructed, "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.) It was also instructed that it could "consider evidence . . . of the defendant's voluntary intoxication . . . in deciding whether the defendant acted with the specific intent to commit an assault by means of force likely to cause great bodily injury." (CALCRIM No. 3426.)

The prosecutor, however, paid lip service to the voluntary intoxication instruction and purported to be merely explaining it. As already discussed, voluntary intoxication that prevents the formation of specific intent and voluntary intoxication that causes a mistake of fact can overlap. We would not expect a lay jury to detect, based on the instruction alone, the flaw in the prosecutor's argument. (See *People v. Centeno*, *supra*,

15

60 Cal.4th at pp. 676-677 [prosecutor's misstatement of reasonable doubt standard was prejudicial where "[i]t did not directly contradict the trial court's instruction on proof beyond a reasonable doubt, but instead purported to illustrate that standard."].)

We therefore conclude that the ineffective assistance was prejudicial with regard to the burglary conviction. The error, however, did not affect the simple battery conviction. As the prosecutor correctly indicated, battery is a general intent offense (*James v. State of California* (2014) 229 Cal.App.4th 130, 142), and voluntary intoxication is not a defense to a general intent offense. (*People v. Atkins* (2001) 25 Cal.4th 76, 81-82.) Accordingly, the simple battery conviction may stand.

III

THE SUFFICIENCY OF THE EVIDENCE

OF THE INTENT TO COMMIT A FELONY

Defendant contends that there was insufficient evidence that, when he entered the house, he intended to commit a felony. As we have already held, in part II.B, *ante*, the burglary conviction must be reversed in any event. Nevertheless, we address this issue because, if defendant is correct, double jeopardy principles would bar his retrial for burglary. (*People v. Hill* (1998) 17 Cal.4th 800, 848; see generally *Burks v. United States* (1978) 437 U.S. 1, 16-17.)

Burglary is committed by entering a house or other specified structure "with intent to commit grand or petit larceny *or any felony* . . . ." (Pen. Code, § 459, italics added.) "A necessary element to this crime is that the intent to commit the theft or felony must

16

exist at the time of entry.  [Citation.]"  (*In re Leanna W.* (2004) 120 Cal.App.4th 735, 741.)

The prosecution's theory was that the intended felony was assault by means of force likely to cause great bodily injury, a felony.  (Pen. Code, § 245, subd. (a)(4).)[6] Thus, the jury was instructed that, to find defendant guilty of burglary, it had to find that "he intended to commit an assault by means of force likely to cause great bodily injury." Simple assault would be only a misdemeanor.  (Pen. Code, §§ 240, 241, subd. (a).)

""""When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]  We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]  In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' [Citation.]"  (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104.)  """"[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed

---

**6**     The trial court found insufficient evidence that defendant entered with the intent to commit felony vandalism (Pen. Code, § 594, subds. (a), (b)(1)) by damaging Michelle's laptop, and it barred the People from proceeding on this theory.

17

simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.]"' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 945.)

As a general rule, the actual commission of a crime inside a structure supports a finding that the defendant intended to commit that crime when he or she entered the structure. For example, "[e]vidence of theft of property following entry may create a reasonable inference that the intent to steal existed at the moment of entry. [Citation.]" (*In re Matthew A*. (2008) 165 Cal.App.4th 537, 541.)

There was sufficient evidence that defendant did actually commit assault by means of force likely to cause great bodily injury. "Consistent with its meaning in analogous statutory contexts, 'great bodily injury' refers to 'significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.' [Citations.]" (*People v. Wyatt* (2012) 55 Cal.4th 694, 702; see also CALCRIM No. 875.) "Because the statute speaks to the capability of inflicting significant injury, neither physical contact nor actual injury is required to support a conviction. [Citation.] However, if injuries do result, the nature of such injuries and their location are relevant facts for consideration in determining whether an object was used in a manner capable of producing and likely to produce great bodily injury. [Citations.]" (*People v. Brown* (2012) 210 Cal.App.4th 1, 7.)

Here, defendant struck repeated bare-knuckled blows to Berryman's face and head. Berryman suffered a concussion. He was left with facial swelling that took a month to subside. This was sufficient evidence of force likely to cause great bodily injury.

18

Separately and alternatively, choking alone can constitute force likely to cause great bodily injury. (*People v. Covino* (1980) 100 Cal.App.3d 660, 664-665, 667-668.)

Defendant relies on the fact that the jury found him not guilty of battery causing serious bodily injury, and guilty only of simple battery. This confuses two wholly distinct issues — insufficiency of the evidence and inconsistency of the verdicts. "A jury in a criminal case may return inconsistent verdicts. [Citations.]" (*People v. Williams* (2001) 25 Cal.4th 441, 449.) "[T]he fact that a guilty verdict on one count is inconsistent with an acquittal verdict on another no longer compels reversal if there is substantial evidence to support the conviction. [Citation.]" (*People v. Pahl* (1991) 226 Cal.App.3d 1651, 1657.)

"'"[R]eview of the sufficiency of the evidence . . . should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient . . . ."'" [Citation.]" (*People v. Superior Court (Sparks)* (2010) 48 Cal.4th 1, 13.)

Defendant also argues that, when he entered the house, he did not know that Berryman was inside. He claims that, while he may have suspected Michelle was inside, there was no evidence that he would have used the same degree of force against her. This is fairly inferable, however, from the fact that Michelle was the person he was primarily angry with. He had no motive for attacking Berryman, other than that he was angry with

19

Michelle and he was displacing that anger onto Berryman. Significantly, he also smashed Michelle's laptop, apparently only because it was an inanimate object belonging to her. It was fairly inferable that, if he had found her in the house, he would have assaulted her with the same or even greater force.

We therefore conclude that there was sufficient evidence that defendant entered the house with the intent to commit assault with force likely to cause great bodily injury.

IV

THE ADMISSION OF EVIDENCE UNDER EVIDENCE CODE SECTION 1109

Defendant contends the trial court erred by admitting evidence of an uncharged act of domestic violence, because none of the charged crimes involved domestic violence. As already discussed (see part II.B, *ante*), we must reverse the burglary conviction in any event. We discuss this contention because if defendant is correct, it would require reversal of the simple battery conviction. We also discuss it for the guidance of the trial court on remand.

A. *Additional Factual Background.*

The following evidence of an uncharged domestic violence incident was introduced at trial.

At the time of trial, Cecilia Caipo was defendant's girlfriend; they had been living together for over a year.

On October 29, 2012, defendant and Caipo got into an argument. He tried to grab her cell phone. He slapped her twice. He also grabbed her shirt, and "in [the] tussle," it

20

got ripped. Caipo ran outside. The neighbors called the police. When the police arrived, Caipo was crying.

Caipo testified that she slapped defendant before he slapped her. However, she did not remember telling this to the police.

B.    *Additional Procedural Background.*

The prosecution and defense counsel filed cross-motions in limine to admit and to exclude, respectively, evidence of the uncharged domestic violence involving Caipo. Defense counsel argued, among other things, that "[t]he case before this court is not a domestic violence case." The trial court ruled that the evidence was not admissible under Evidence Code section 1101, subdivision (b). However, it admitted the evidence under Evidence Code section 1109.

After Caipo's direct examination, defense counsel moved for a mistrial. The trial court denied the motion, ruling again that the evidence was admissible under Evidence Code section 1109.

The jury was instructed: "If you decide that the defendant committed the uncharged domestic violence, you may but are not required to conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit residential burglary, as charged here."

21

C.      *Analysis*.

Subject to exceptions not applicable here, Evidence Code section 1109 allows the admission of evidence of uncharged domestic violence "in a criminal action in which the defendant is accused of an offense involving domestic violence . . . ." (Evid. Code, § 1109, subd. (a).)

As used in Evidence Code section 1109, "'[d]omestic violence' has the meaning set forth in Section 13700 of the Penal Code. Subject to a hearing conducted pursuant to Section 352, . . . 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense."

Penal Code section 13700, as relevant here, provides:

"(a) 'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another.

"(b) 'Domestic violence' means abuse committed against an adult or a minor who is a . . . person with whom the suspect . . . is having or has had a dating or engagement relationship."

As already discussed (see part III, *ante*), the prosecution's theory was that defendant committed burglary because he entered with the intent to commit the felony of assault by means of force likely to cause great bodily injury. This tees up the question of who was the intended victim of the intended assault. Ultimately, as we know, defendant

22

actually assaulted Berryman. The burglary charge, however, was based on the assault that

he *intended* to commit when he entered the house, not the assault that he *actually*

committed (except to the extent that the latter was some evidence of the former).

There was substantial evidence that defendant actually intended to assault

Michelle. He had been following her around all night, even though she had told him to

leave her alone. He was jealous and angry, as shown by his outburst after Michelle

hugged Souther. According to one of his voicemails, he believed Michelle was inside the

house. Also, he testified that he checked Michelle's bed to see if she was in it. Finally,

he had no real motive to assault Berryman, other than out of frustration at not being able

to assault Michelle, as intended.

Thus, there was substantial evidence that the intended assault constituted domestic

violence within the meaning of Penal Code section 13700. In our view, when the

intended felony that underlies a burglary would constitute domestic violence, the burglary

is itself "an offense involving domestic violence" within the meaning of Evidence Code

section 1109. Under almost any definition of "involve," when the specific intent element

of a charged crime is satisfied by proof of the intent to commit a further crime of

domestic violence, the charged crime *involves* domestic violence.[7] Certainly this is true

---

[7] The People urge us to rely on the definition of domestic violence in Family Code section 6211. That definition requires "abuse," which includes "any behavior that has been or could be enjoined pursuant to Section 6320" (Fam. Code, § 6203), which in turn includes "making annoying telephone calls as described in Section 653m of the Penal Code" and "destroying personal property . . . ." (Fam. Code, § 6320, subd. (a).)

*[footnote continued on next page]*

23

when the intended domestic violence crime is actually committed.  (*People v. James* (2010) 191 Cal.App.4th 478, 483-484.)  We believe it is equally true when the intended domestic violence crime is *not* committed.

Defendant argues that "[i]n order to constitute domestic violence, Michelle must have suffered some 'abuse' as defined by Penal Code section 13700."  This overlooks the peculiar nature of burglary — it criminalizes the actus reus of entering (even when it is perfectly harmless), provided it is accompanied by a felonious mens rea (even when it is not carried out).  In this respect, burglary resembles inchoate crimes such as attempt, conspiracy, and solicitation.  An attempt to commit domestic violence "involves" domestic violence.  (See *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1114-1121 [prior domestic violence admitted in prosecution for attempted murder].)

We therefore conclude that the trial court did not err by admitting evidence of the uncharged domestic violence incident under Evidence Code section 1109.

---

*[footnote continued from previous page]*
We need not decide whether this definition would apply here.  It is significant, however, that under our analysis, we need only look at whether the defendant entered a structure with the intent to commit a felony that would constitute domestic violence.  By contrast, under the People's analysis, the intended felony is apparently irrelevant, as long as the defendant did, in fact, make annoying telephone calls or destroy personal property before, during, or after the entry.  This demonstrates that we are using a more narrow and readily supportable definition of "involve" than are the People.

V

DISPOSITION

The judgment is reversed.  The conviction for burglary is reversed; the conviction for simple battery is affirmed.  On remand, if the prosecution elects not to retry the burglary charge, or if the prosecution fails to retry the burglary charge in a timely manner (see Pen. Code, § 1382, subd. (a)(2)), the trial court shall promptly resentence defendant.

The clerk of this court is directed to send a copy of this opinion to the State Bar immediately upon the issuance of the remittitur.  (Bus. & Prof. Code, § 6086.7, subd. (a)(2).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

KING
J.