Filed 12/22/15  P. v. Hubbard CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B255723 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA061111) |
| v. | |
| ANTONIO MAURICE HUBBARD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Lisa Mangay Chung, Judge.  Affirmed.

Christopher Nalls, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Viet H. Nguyen, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Antonio Maurice Hubbard appeals from the judgment entered following a jury trial in which he was convicted of attempting to dissuade a witness and two counts of assault with a deadly weapon. Defendant contends the evidence is insufficient to support one of the aggravated assault convictions and that his trial attorney was constitutionally ineffective because he failed to object to misstatements of the law by the prosecutor during argument. We affirm.

## BACKGROUND

**1.      Events prior to the charged offenses**

Kenneth Deandre Shannon, also known as Cowboy, robbed a teenager who was walking in Lancaster on the night of September 29, 2013.[1] Marcel Stokes was with Shannon at the time of the robbery. Shannon and Stokes parted company, and Stokes returned to the scene of the robbery, where he was soon joined by sheriff's deputies and the teenaged victim. Stokes told the deputies about the robbery, but falsely claimed he did not know where Shannon lived. Shannon was arrested and charged with the robbery.

On October 11, Shannon called his girlfriend, Monique Spirlin, from jail. Spirlin told Shannon she had informed "Beefy" (Weldon Spurling) and "Shady" (Robert McNabb) that Stokes was present during the robbery, then related the efforts by Spurling and McNabb to locate Stokes, who was also known as "Boss Hog." Spurling told Spirlin that he would return to Lancaster with "the homies."

**2.      The charged offenses and defendant's arrest**

On the night of October 15, Spurling and McNabb arrived at Spirlin's home with defendant and his brother Travion Hubbard. The four men and Shannon shared a very close relationship and referred to one another as brothers. McNabb was upset that Stokes caused Shannon to be arrested and jailed.

Later that night, Stokes was walking in Lancaster with his friend Jerome Washington when three or four men began walking behind them. One of the men, later

---

[1] Date references pertain to 2013.

2

identified as Spurling,[2] got in front of Stokes and Washington and asked who was Boss Hog. Stokes and Washington both denied they were Boss Hog. Spurling then asked his companions for Boss Hog's actual name. Defendant[3] responded, "Marcel." Another man then pulled out a BB gun that appeared to be a semiautomatic handgun and pointed it toward Stokes and Washington. Stokes identified Travion as the man with the gun, whereas Washington was adamant that Spurling had the gun, although he identified Travion as part of the group. Stokes testified Travion said, "'Don't move,'" and held the gun about one foot from Washington's face. Both Stokes and Washington moved from the sidewalk into the street. Washington testified that Stokes darted behind him, and, although Spurling was then pointing the gun toward Washington, Spurling told Washington to get out of the way.

Spurling asked why his "brother" Cowboy was in jail, why Stokes was not in jail, and why Stokes had "snitched" on Cowboy. Stokes denied he had anything to do with Cowboy's incarceration. Spurling then struck Stokes. Stokes testified Spurling and the other man he had identified at the preliminary hearing (defendant) punched him with their fists and kicked him, but Travion was the person who hit him with the gun. Stokes testified that after hitting him with the gun, Travion resumed pointing the gun at Washington. According to Washington, Spurling struck Stokes with the gun, which rattled as if some part of it were loose. Washington testified that Travion at some point kicked Stokes, but Travion mostly stood near Washington and responded to Washington's denial of any involvement in Cowboy's arrest by saying they would "'find out'" or "'see'" whether that was the truth.

The men then ran away. Washington testified Spurling said, "'Insane Crip'" as he left, while Stokes testified one man said, "'This is a warning,'" and another man said,

---

[2] The Attorney General incorrectly states defendant was the man who got in front of Stokes and Washington and spoke to them.

[3] Stokes identified defendant at the preliminary hearing but not at trial.

3

"'This is Insane.'" Stokes testified he understood these statements to mean not to "let" "whatever happened to Cowboy" "happen again." Stokes and Washington called 911.

A few hours later, sheriff's deputies stopped a car containing defendant, Travion, and Spurling. Deputies found a BB gun that appeared to be a semiautomatic handgun in the trunk of the car. The gun was made of hard plastic and the grip had a compartment into which a carbon dioxide canister would be placed, but otherwise it appeared to be a real firearm. Deputies could not locate Stokes, but they brought Washington to the scene for a field showup. Washington identified Spurling and Travion, but not defendant, as persons involved in the confrontation and beating. Specifically, Washington identified Spurling as the man who had a gun and Travion as a person who had kicked Stokes. McNabb was detained at Spirlin's house.

### 3.     Statements to the police by defendant and Spirlin

Spirlin told investigators that McNabb was upset with Stokes because he had been told that Stokes was responsible for Shannon being in jail. The same person told McNabb that Stokes would be at the park.

Investigators interviewed defendant twice. During the first interview, defendant said he had traveled to Lancaster with Spurling and Travion. Defendant denied knowing McNabb and Shannon and denied knowledge of the incident with Stokes and Washington. During the second interview, a recording of which was played during trial, defendant admitted he knew Shannon and considered him to be like a brother. Defendant further admitted he was present when McNabb hit Stokes with a BB gun, and that defendant had punched Stokes once and kicked him once. Defendant further admitted he was upset with Stokes "for getting Cowboy locked up," although defendant did not know what charge had led to Cowboy's arrest. Defendant agreed he was "going along with the program" and "situation" set up by his "hom[]ies" and "brothers." Defendant told the investigators that "[a]fter it was over," McNabb "and them said" something to the effect that Cowboy had better be released before the next court date.

4

**4.     Verdict and sentence**

The jury convicted defendant of attempting to dissuade a witness and two counts of assault with a deadly weapon.[4]  Defendant admitted he had served a prior prison term within the scope of Penal Code section 667.5, subdivision (b).[5]  The trial court sentenced defendant to an aggregate term of six years, consisting of four years for the aggravated assault on Stokes, a one-year consecutive term for the aggravated assault on Washington, and one year for the prior prison term enhancement, with a concurrent term for attempted dissuading.

**DISCUSSION**

**1.     Sufficiency of evidence for assault with a deadly weapon conviction pertaining to victim Washington**

Defendant contends that the evidence was insufficient to support his conviction for assault with a deadly weapon upon Washington because the BB gun was merely pointed at Washington and the prosecution did not introduce evidence showing that the BB gun was loaded, operable, and capable of producing great bodily injury.

**a.     Relevant legal principles**

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."  (§ 240.)  A deadly weapon may be any object, instrument, or weapon used so as to be capable of producing, and likely to produce, death or great bodily injury.  (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028–1029 (*Aguilar*).)  Great bodily injury is significant or substantial injury.  (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066.)

"In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is

---

[4] Travion, Spurling, and McNabb were also charged.  Spurling and McNabb were tried together, while Travion and defendant were tried together, but with separate juries.

[5] Undesignated statutory references are to the Penal Code.

used, and all other facts relevant to the issue." (*Aguilar*, *supra*, 16 Cal.4th at p. 1029.) Evidence supporting an inference that a defendant intended, if necessary, to use the object as a weapon tends to establish its character as a dangerous or deadly weapon. (*People v. Page* (2004) 123 Cal.App.4th 1466, 1471.) "[A]n instrument can be a deadly weapon even if it is not actually used with deadly force." (*Id*. at p. 1472.) Pointing an unloaded or inoperable gun in a threatening manner at another person, without any effort or threat to use it as a bludgeon, does not support conviction of assault with a deadly weapon because the defendant does not have the present ability to inflict a violent injury. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 10–11, fn. 3; *People v. Wolcott* (1983) 34 Cal.3d 92, 99.) "A defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a loaded weapon." (*Rodriguez*, at p. 13.)

Criminal judgments must be supported by evidence sufficient to persuade a reasonable jury of guilt beyond a reasonable doubt. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.) In assessing the sufficiency of evidence, ""we review the whole record in the light most favorable to the judgment"" to decide whether substantial evidence supports the conviction, so that a reasonable jury could find guilt beyond a reasonable doubt. (*People v. Tully* (2012) 54 Cal.4th 952, 1006.) Substantial evidence is ""evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."" (*Ibid*.) We presume the existence of every fact supporting the judgment that the jury could reasonably have deduced from the evidence and make all reasonable inferences that support the judgment. (*People v. Barnes* (1986) 42 Cal.3d 284, 303; *People v. Catlin* (2001) 26 Cal.4th 81, 139.)

**b.    Sufficient evidence supports the challenged conviction**

Several published decisions have upheld convictions of assault with a deadly weapon where the weapon was a loaded and operable BB gun. (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 541; *People v. Brown* (2012) 210 Cal.App.4th 1, 8.) In *Lochtefeld*, the prosecution introduced extensive evidence regarding the ability of the BB gun to fire fast-moving pellets and the ability of those pellets to penetrate human tissue.

6

(77 Cal.App.4th at pp. 536–537.)  In *Brown*, the prosecution failed to introduce such evidence, but the defendant had fired the gun at the victims, and the pellets that hit the victims inflicted red welts on their skin.  (210 Cal.App.4th at p. 5.)  Here, however, the prosecution failed to introduce any evidence that the BB gun was loaded with pellets and the required carbon dioxide canister when it was recovered, or that the BB gun was even operable.  Thus, had defendant's accomplice simply pointed the BB gun at Washington and Stokes, the use of the BB gun would have been insufficient evidence to support either assault with a deadly weapon conviction.  However, the accomplice used the BB gun on Stokes as a bludgeon, and, according to Stokes's testimony, then returned to point the gun at Washington from a short distance away.  The jury could reasonably have inferred he intended to use it on Washington in the same manner if Washington resisted the assailants or made any threatening gesture.  (*People v. Fain* (1983) 34 Cal.3d 350, 356–357 & fn. 6 [evidence sufficient to support three counts of assault with deadly weapon where defendant struck two of the three victims with his purportedly unloaded gun, and jury could infer defendant also would have struck third victim, at whom defendant merely pointed the gun].)  Accordingly, viewed in the light most favorable to the judgment, the evidence supports the assault with a deadly weapon conviction with respect to victim Washington.

**2.     Ineffective assistance of counsel**

Defendant contends that his conviction for attempting to dissuade a witness must be reversed because his trial attorney rendered ineffective assistance by failing to object to the prosecutor's argument telling the jury it could convict defendant of attempting to dissuade a witness on the basis of the natural and probable consequences doctrine.  We conclude defendant has not demonstrated prejudice.

**a.     Relevant legal principles**

Defendant was charged with, and convicted of, violating section 136.1, subdivision (a)(2), which penalizes "[k]nowingly and maliciously attempt[ing] to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or

7

inquiry authorized by law." Dissuading and attempted dissuading are specific intent crimes. (§ 21a; *People v. Young* (2005) 34 Cal.4th 1149, 1210.) The defendant must intend that his or her acts or statements affect or influence the testimony or attendance of a potential witness or victim. (*People v. Wahidi* (2013) 222 Cal.App.4th 802, 806.) "The circumstances in which the defendant's statement is made, not just the statement itself, must be considered to determine whether the statement constitutes an attempt to dissuade a witness from testifying. [Citation.] If the defendant's actions or statements are ambiguous, but reasonably may be interpreted as intending to achieve the future consequence of dissuading the witness from testifying, the offense has been committed." (*Ibid.*)

A person aids and abets the commission of a crime when he or she, with knowledge of the unlawful purpose of the perpetrator, and with the intent or purpose of committing, facilitating or encouraging commission of the crime, "by act or advice, aids, promotes, encourages or instigates, the commission of the crime." (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) The same criminal liability attaches whether a defendant directly perpetrates an offense or aids and abets the perpetrator. (§ 31; *People v. Montoya* (1994) 7 Cal.4th 1027, 1038–1039.) "[U]nder the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.'" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) However, "[w]hen the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must] give[] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.'" (*People v. Lee* (2003) 31 Cal.4th 613, 624.)

A prosecutor commits misconduct by misstating the law. (*People v. Otero* (2012) 210 Cal.App.4th 865, 870.) If a prosecutorial misconduct claim is based on the prosecutor's arguments to the jury, we consider whether, considering the challenged

8

statements in the context of the argument as a whole, there is a reasonable likelihood that the jury construed or applied any of the challenged statements in an objectionable fashion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1202–1203.)  No misconduct exists if a juror would have taken the statement to state or imply nothing harmful.  (*People v. Benson* (1990) 52 Cal.3d 754, 793.)  "'[W]e "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' [Citation.]"  (*People v. Dykes* (2009) 46 Cal.4th 731, 772.)  To preserve a claim of prosecutorial misconduct for appeal, the defendant must make a timely objection at trial on the ground asserted on appeal and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm or objection would have been futile.  (*People v. Thomas* (2012) 54 Cal.4th 908, 937.)

A claim that counsel was ineffective requires a showing, by a preponderance of the evidence, of objectively unreasonable performance by counsel and a reasonable probability that, but for counsel's errors, the defendant would have obtained a more favorable result.  (*In re Jones* (1996) 13 Cal.4th 552, 561.)  "'''A reasonable probability is a probability sufficient to undermine confidence in the outcome.''''  (*Ibid.*)  If the defendant fails to show prejudice, a reviewing court may reject such a claim without assessing the adequacy of counsel's performance.  (*People v. Mendoza* (2000) 24 Cal.4th 130, 170.)

### b.     The pertinent instructions

The trial court instructed the jury before the attorneys gave their closing arguments.  It instructed upon the elements of attempted dissuading, simple assault, assault with a deadly weapon, and assault by means of force likely to produce great bodily injury.  (CALCRIM Nos. 875, 915, 2622.)  The court further instructed the jury on aiding and abetting principles, including the natural and probable consequences doctrine. (CALCRIM Nos. 400, 401, 403.)

The court expressly limited the application of its instruction upon the natural and probable consequences doctrine to conviction of assault with a deadly weapon.  The instruction stated, in pertinent part:  "Before you may decide whether the defendant is

9

guilty of assault with a deadly weapon, you must decide whether he is guilty of simple assault or assault by force likely to produce great bodily injury. [¶] To prove that the defendant is guilty of assault with a deadly weapon, the People must prove that: [¶] 1. The defendant is guilty of simple assault or assault by force likely to produce great bodily injury; [¶] 2. During the commission of simple assault or assault by force likely to produce great bodily injury, a coparticipant in that simple assault or assault by force likely to produce great bodily injury, committed the crime of assault with a deadly weapon; [¶] AND [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the assault with a deadly weapon was a natural and probable consequence of the commission of the simple assault or assault by force likely to produce great bodily injury."

### c. The prosecutor's arguments

The prosecutor argued with respect to the assault on Stokes that defendant was both a direct perpetrator because he admitted kicking and punching Stokes and he aided and abetted his companions: "So that will be like in this case where the defendant goes out with his other homeys in a pack of men looking for someone else and they all beat up Marcel Stokes. . . . [¶] . . . So it doesn't matter that Antonio Hubbard is not the one who actually struck the blow with the gun. It does not matter that Antonio Hubbard is not the person that pointed the gun at . . . Jerome Washington. He's an aider and abettor, and he's just as guilty as the perpetrator, the person who actually did that. [¶] *If the evidence establishes aiding and abetting of one crime, a person may be guilty of other crimes that occurred during the commission of the first crime. Like the first crime was the assault with a deadly weapon being the first crime; and the dissuading, attempting to dissuade a witness being the second crime.*" (Italics added.) Defendant challenges his attorney's failure to object to the italicized portion of the argument.

The prosecutor continued: "And when we're talking about aiding and abetting, it is about assisting, facilitating, encouraging, the criminal conduct; again, like when the defendant, Antonio Hubbard, goes out with his buddies, his homeys, his bros, and they go

10

out in numbers, safety in numbers, and they hunt down Marcel Stokes.  He aids.  He encourages.  He facilitates.  [¶]  *What's the other way that the law says that the defendant is guilty of the crimes?*  [¶]  *Natural and probable consequences, ladies and gentlemen.  A natural and probable consequence . . . is one that a reasonable person would know is likely to happen if nothing unusual intervenes. . . .*  [¶]  *That will be like in this case where a group of individuals goes out and beats up Marcel Stokes, and they knew about before that his case is pending, and he knew about that if Marcel Stokes doesn't show up, Kenneth Shannon would be winning this case because his homeys, his bros are pissed off.*  [¶]  To prove that the defendant is guilty under natural and probable consequences, the People must prove that the defendant is guilty of a mere simple assault or assault by force likely to produce great bodily injury; so just like the kick, the punch, any of that.  [¶]  During the simple assault or assault by force likely to produce great bodily injury, a co-participant, his homey, his bro, committed the crime of assault with a deadly weapon.  Used that gun, struck somebody, pointed it at someone.  [¶]  A reasonable person in the defendant's position would have known that the commission of the assault with a deadly weapon was a natural and probable consequence of the simple assault or other assault, meaning that you are in for a penny, you are in for a pound when you go out late at night with your homeys and you go looking for someone in a neighborhood you don't know and you are prepared for whatever is out there to meet force with force.  Natural and probable consequences."  (Italics added.)  Defendant challenges his attorney's failure to object to the italicized portion of the argument.

In his rebuttal argument, the prosecutor argued defendant minimized his role in the offenses while speaking to investigators:  "'I just followed them[.]'  . . . I just beat up those people.  *I just beat up Marcel Stokes.  I just followed them.  I am not an aider.  I am not an abettor.  It wasn't a natural and probable consequence of going out late at night with these other individuals going to an area.*"  (Italics added.)  Defendant challenges his attorney's failure to object to the italicized segment.

Soon thereafter, the prosecutor argued: "[Defense counsel] brought up the whole analogy, remember, about baseball and an umpire, things like that, I was kind of just curious about that. And during my spare time, I was preparing for this case, looking at aiding and abetting, and I looked up the World Series. And did you know that when a team wins the World Series, generally everybody in that team gets a win even if they only played one inning or maybe even if they did not play because they are part of that team? *Because they aid and abet the team, because it is a natural and probable consequence of being on that team.* [¶] *It is the same way with Antonio Hubbard. When he is part of that team, part of that group of men that go out looking for Marcel Stokes: aider and abettor, natural and probable consequences. He's guilty.*" (Italics added.) Defendant challenges his attorney's failure to object to the italicized segment.

### d. Defendant has not shown prejudice

Read in context, none of the challenged arguments by the prosecutor told the jury that it could convict defendant of attempting to dissuade a witness based upon a natural and probable consequences theory. Of the several argument fragments cited by defendant, only the prosecutor's first remark set forth above ("If the evidence establishes aiding and abetting of one crime, a person may be guilty of other crimes that occurred during the commission of the first crime. Like the first crime was the assault with a deadly weapon being the first crime; and the dissuading, attempting to dissuade a witness being the second crime") potentially suggested that an attempting to dissuade a witness conviction could result from commission of a target offense of assault with a deadly weapon. However, the prosecutor did not refer to the natural and probable consequences doctrine at that moment, and it is not reasonably likely that the jury would have understood the prosecutor to be arguing that the jury could apply the natural and probable consequences doctrine to convict defendant of attempting to dissuade a witness. Thereafter, when the prosecutor invoked the natural and probable consequences doctrine, he expressly argued that it applied to defendant's guilt of assault with a deadly weapon, even though defendant did not handle the BB gun. In the challenged portions of the

12

prosecutor's rebuttal argument, the prosecutor simply referred to the doctrine, without suggesting its use as a path to convict defendant of attempted dissuading. Thus, although the prosecutor's initial misstep created a basis for defense counsel to object, the remainder of the prosecutor's argument was unobjectionable and established the correct context for application of the doctrine.

The jury instructions on the natural and probable consequences doctrine did not merely mention in passing that it applied only to conviction of assault with a deadly weapon, but set forth the elements for application of the doctrine expressly in terms of aggravated and simple assault, leaving no room for the jury to apply the doctrine to convict defendant of attempting to dissuade a witness. The jury was also instructed that if it "believ[ed] that the attorneys' comments on the law conflict[ed] with" the court's instructions, the jury must follow the court's instructions. (CALCRIM No. 200.) We presume the jury followed the court's instructions. (*People v. Williams* (2010) 49 Cal.4th 405, 469.)

Moreover, the evidence strongly suggested that defendant shared the specific intent to attempt to dissuade Stokes from attending court hearings and giving testimony in Shannon's case. Defendant admitted participating in the attack on Stokes, which followed the confrontation in which Spurling questioned Stokes and Washington about the identity of Boss Hog and why Cowboy was in jail. Defendant, who did not reside in the area, even knew that "Marcel" was Boss Hog. Furthermore, defendant had traveled all the way from Long Beach to Lancaster with Spurling and McNabb, who had previously been searching for Stokes and were upset that Stokes played a role in Shannon's arrest and incarceration. Defendant shared a close relationship with Shannon, Spurling, and McNabb. The jury could reasonably infer that Spurling and McNabb had informed defendant of their intent to search for and intimidate Stokes. Thus, the context and events preceding the actual attack provided strong circumstantial evidence that defendant shared a specific intent to attempt to dissuade Stokes from attending or testifying at future hearings in Shannon's case. There was neither the need nor the

13

opportunity, under the court's instructions, for the jury to resort to the natural and probable consequences doctrine to convict defendant of attempted dissuading.

For all of these reasons, defendant has not met his burden of establishing a reasonable probability that he would have obtained a more favorable result if his attorney had objected to any or all of the challenged arguments.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


LUI, J.

We concur:


ROTHSCHILD, P. J.


JOHNSON, J.

14