Filed 4/15/22  P. v. Williams CA3
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SHELDON DALE WILLIAMS,<br><br>Defendant and Appellant. | C088772<br><br>(Super. Ct. No. 18FE012067)<br><br>OPINION ON TRANSFER |

Defendant Sheldon Dale Williams originally appealed a judgment entered following a court trial wherein he was convicted of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)),[1] infliction of corporal injury on a spouse resulting in traumatic condition (§ 273.5, subd. (a)) and making criminal threats (§ 422). The court also found true as to counts one and two that defendant had inflicted great bodily injury under circumstances of domestic violence (§ 12022.7, subd. (e)) and that he had suffered both a

---

[1] Subsequent undesignated statutory references are to the Penal Code.

1

prior strike (§§ 667, subds. (b)-(i), 1170.12) and a prior serious felony conviction (§ 667, subd. (a)). In accordance with a lid established in exchange for defendant waiving his right to a trial by jury, defendant was sentenced to prison for an aggregate state prison term of 15 years.

On appeal, defendant challenged the sufficiency of the evidence supporting several of his convictions and the domestic violence special circumstances. First, he argued insufficient evidence supports his conviction for assault with a deadly weapon, specifically that there was insufficient proof that the BB gun was capable of and/or likely to produce great bodily injury. Second, defendant attacked the true finding that he inflicted great bodily injury when he shot the victim with the BB gun, arguing her injuries were at most moderate. Similarly, defendant also attacked the sufficiency of the severity of the injury supporting the great bodily injury enhancement associated with the corporal injury count, arguing a nondisplaced fracture of a facial bone is insufficient. Finally, defendant argued insufficient evidence supports his criminal threats conviction because there was no proof of sustained fear and/or that such fear would be reasonable. We disagreed and issued an opinion affirming the judgment against him. (*People v. Williams* (Nov. 17, 2021, C088772) [nonpub. opn.].)

Defendant then filed a petition for review in the California Supreme Court, which granted his petition and transferred the matter back to this court with directions to vacate our previous decision and "reconsider the cause in light of Assembly Bill No. 124 (Stats. 2021, ch. 695)." On remand, defendant has filed a supplemental brief requesting remand for resentencing in light of the changes to the trial court's discretion to select a triad term under section 1170, as amended by Assembly Bill No. 124 (2021-2022 Reg. Sess.) and Senate Bill No. 567 (2021-2022 Reg. Sess.). The People concur that defendant is entitled to resentencing, and we agree that the matter should be remanded for that purpose for the reasons we shall explain herein. Our previous decision denying defendant's original

2

claims otherwise remains unchanged, and we will again affirm his judgment of conviction.

## I.  BACKGROUND

### A.  *The Amended Felony Information*

On November 5, 2018, the People filed an amended felony information alleging that between March 1, 2018, and June 21, 2018, defendant committed three separate law violations upon the victim, A.D.  Count one alleged defendant committed assault with a deadly weapon (§ 245, subd. (a)(1)) by BB gun.  Count two alleged defendant inflicted corporal injury on a spouse resulting in traumatic condition (§ 273.5, subd. (a)) and count three charged defendant with making criminal threats (§ 422).  The information further alleged as to counts one and two that defendant personally inflicted great bodily injury under circumstances of domestic violence (§ 12022.7, subd. (e)) and that defendant had suffered a prior strike (§§ 667, subds. (b)-(i), 1170.12) as well as a prior conviction for a serious felony (§ 667, subd. (a)).  Defendant pleaded not guilty and waived his right to a jury trial in exchange for a sentencing lid of 15 years.

### B.  *The Trial and Sentence*

Defendant and A.D. began living together in July 2016, and the couple married in March 2017.  Their child was born in May 2017, and they remained married at the time of trial.  A.D. did not want to testify and expressed her longing to reunite with defendant.  As can happen in domestic violence matters, by trial, A.D. was a less than cooperative witness, who attempted to minimize defendant's behavior.  Nonetheless, A.D. did reluctantly concede that defendant at unspecified times broke her cell phone by throwing it on the floor, shot her with a BB gun while "playing around," hit her with a shower rod on her side, punched her in the face causing a bruise before she went to the hospital, bit her causing a mark on her shoulder, told her he hated her while throwing a knife at her, and held a pillow over her face.  The remainder of the details that follow herein come

3

from other witnesses who had either observed A.D.'s injuries or had been previously told by A.D. of the abuse.

A.D. was mentally disabled and received social security disability income. After she moved in with defendant, she stopped regularly communicating with her family. After the baby was born, the family had not heard from A.D. in months, and she was not responding to attempts to contact her, so her family started looking for her.

Unbeknownst to A.D.'s family, on March 16, 2018, police responded to the apartment A.D. shared with the defendant. A.D. disclosed that she and defendant had been arguing over an alleged affair, and during this argument, defendant punched her with a closed fist in the face three times, as well as hitting her on her arms and back. The responding officer noted a two-inch bruise under A.D.'s left eye, which A.D. said was from earlier in the week. A.D. was afraid of defendant and what he would do if she reported his abuse to the police, but she called them anyway from a neighbor's phone because she did not have one. A.D. also limited her movements because she was afraid of defendant, but she did not mention being shot by a BB gun. Defendant was arrested, but released the same day.

Around this time, A.D. finally got in touch with a family member and her family arranged to take her and the baby to one of their homes. After A.D. was away from defendant, she disclosed to her stepmother that defendant had taken her phone and was holding her hostage.[2] She also disclosed that defendant regularly shot her with his BB gun when he was angry and had beaten her, including throwing her against a wall. A.D.'s stepmother observed the BB wounds all over A.D.'s body, from her head to her feet. A.D. disclosed that defendant had shot her multiple times with the BB gun over the course of about a week.

---

[2] A.D. also disclosed that defendant was preventing her from attending her medical appointments for a heart surgery that she needed.

4

A.D. complained of pain in her arms, back, eye, and her jaw, so her stepmother took her to the emergency room. At the hospital, the physician assistant observed a black eye, as well as swelling of A.D.'s cheek and upper jaw. A CAT scan showed A.D. had fractured the zygoma, which is a large bone that forms the lateral part of the eye.[3] This large, strong bone would be difficult to fracture and is designed to protect the eye. Damage to this bone is serious because if the zygoma does not successfully take the impact of a blow, loss of an eye or death is possible. Because the fracture was not displaced, pain management was the only treatment prescribed. A.D. continued to complain of pain and had difficulty opening her mouth and eating for about two weeks. A.D. told her stepmother this injury had occurred when defendant punched her in the face and threw her against a wall.

A.D. reconciled with defendant and moved back in with him in June 2018. About a week later, A.D. called her stepmother. She was crying and upset. Several members of A.D.'s family, including a close family friend, immediately set off to Sacramento to get A.D. and the baby.

When they arrived, they discovered A.D. and defendant in the midst of a heated argument. A.D.'s stepmother told her to get the baby and some belongings so they could leave. In response, defendant told A.D. she could not leave and that "you're not taking my baby." He threatened to have someone block the driveway and retrieved what looked like a shotgun wrapped in a towel, which he pointed at them.[4] One of the group grabbed the baby and fled the apartment, calling the police and driving to the police station. The remaining family waited outside the apartment for the police to arrive.

---

[3] While A.D.'s stepmother believed that A.D.'s jaw was broken, the physician assistant confirmed the jaw was intact, but that A.D. was suffering pain and swelling in her jaw.

[4] This was later determined to be a rifle style BB gun.

When authorities arrived, A.D. disclosed that she had been fighting with defendant because he believed she was having an affair. Defendant had tried to punch her. A.D., who was distraught, was afraid of defendant. In fact, A.D. had told her neighbors to call the police if they heard arguing because of his threats and also because he had broken her phone. She specifically identified his threat to "put her six feet under," which he had made around March 2018 and which had frightened her. The same day, authorities obtained a restraining order to protect her.

A.D. further disclosed that defendant had previously hit her with his fist, pots, pans, a shower rod, and his BB gun. Defendant had also shot her with the BB gun multiple times. BB wounds to her leg and ankle interfered with her ability to walk. The responding officer observed multiple scars on A.D.'s arms and legs, which were photographically documented (in addition to scars on other parts of A.D.'s body that would normally be covered by clothes). These photographs were admitted into evidence as People's Exhibit No. 1. A family friend also noted "healing holes" on A.D.'s person, consistent with her report to the friend that defendant had shot her with what she assumed was a BB gun. A search of the apartment revealed a pistol style BB gun and a rifle style BB gun wrapped in a towel.

On June 22, 2018, A.D. visited a physician assistant who took four different x-rays of areas that might have retained BB's and documented six such BB's reasonably superficial to the skin. A.D. disclosed to her that defendant had shot her repeatedly with his BB gun at close range over the course of many months. She received a referral to have outpatient surgery to remove the retained BB's.

This outpatient procedure occurred on August 17, 2018, wherein a physician assistant removed five BB's imbedded in less than one centimeter of tissue under the skin from various parts of A.D.'s body. These were removed from her arm, foot, scalp, and

6

hand.[5] They elected not to remove a sixth BB because it was not palpable from the skin's surface, was not then causing A.D. pain, and was deeper than the others. The incisions had to be sutured closed. A.D.'s scars were still apparent at the time of trial.

Finally, the People presented the testimony of defendant's ex-girlfriend with whom he had a child. Defendant accused his ex-girlfriend of having an affair. She was pregnant and spent the night anyway given the late hour. However, when she went to leave the next day, defendant dumped her belongings into the garbage. He also threw her phone against a wall and took her glasses and shoes. He then cut her shoelaces. Finally, he repeatedly pushed her to the ground and beat her with her shoe. Defendant eventually stopped when his sister came into the room, and his ex-girlfriend used defendant's sister's phone to call for a ride. After leaving, she called the police. Thereafter, defendant engaged in harassing conduct, including threating to kill his ex-girlfriend and their baby under various disturbing circumstances. These threats were so serious that his ex-girlfriend dropped out of school in an attempt to avoid defendant and keep herself and her baby safe.

Following the close of the People's case, defendant moved to dismiss the criminal threats count pursuant to section 1118.1, arguing a lack of evidence of a sustained fear. The People argued this charge was based upon defendant's threat to put A.D. six feet under and that her recruitment of neighbors to call police and her actions of not leaving the apartment for fear of defendant met this element. The court agreed the People had presented evidence of A.D.'s fear and denied the motion.

Thereafter, defendant took the stand in his defense, admitting he had slapped A.D. in early 2017 and accidentally shot A.D. with his rapid-fire BB gun in December 2017. However, defendant denied punching A.D. in March 2018 and claimed A.D.'s scarring

_____

[5] While A.D. wanted these removed for purposes of the prosecution, she also expressed that the BB in her hand hurt her when she touched it.

was actually caused by drug use and an itchy rash rather than the BB gun. He also denied threatening anyone with the BB gun in June, which he said he was moving from the living room to the back bedroom for the baby's safety.

Prior to closing arguments, the People identified defendant's hitting A.D. with a closed fist causing her broken bone as the relevant injury for the corporal injury count, and following argument, the court took the matter under submission. The next day, the court announced its ruling finding defendant guilty of all charges and finding the two great bodily injury enhancements true. The court then conducted a court trial on the prior conviction allegations, ultimately finding it true that defendant had suffered a prior strike and serious felony conviction.

On January 11, 2019, the court sentenced defendant to an aggregate prison term of 15 years, comprised of the midterm of three years for the assault with a deadly weapon doubled to six because of the prior strike, plus four years for the great bodily injury enhancement plus five years for prior serious felony conviction. The court then imposed, but stayed sentences for the remaining counts pursuant to section 654.[6] Defendant timely appealed.

## II. DISCUSSION

### A. *The Sufficiency Challenges*

As previously described, defendant challenges the sufficiency of evidence supporting various aspects of his convictions and true findings by the trial court. Here, we set out the standard to be applied to these challenges and then separately address these claims.

---

[6] Our review of the record has disclosed that the abstract of judgment fails to reflect the sentences imposed, but stayed by the court. We will direct the trial court to account for the stayed terms when it prepares an amended abstract of judgment following resentencing.

8

In determining a sufficiency of the evidence challenge, we "review the whole record in the light most favorable to the judgment . . . to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' [Citation.]" (*People v. Cuevas* (1995) 12 Cal.4th 252, 261.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) In other words, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) The standard is the same in cases in which the People rely primarily on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932.) " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" (*Id*. at p. 933.)

1. *Sufficient Evidence Supports the Use of the BB Gun as a Deadly Weapon*

Defendant argues insufficient evidence supports his conviction for assault with a deadly weapon, specifically that that there was insufficient proof that the BB gun was capable of and/or likely to produce great bodily injury. We disagree.

As our high court explained in *People v. Aguilar* (1997) 16 Cal.4th 1023: "Section 245, subdivision (a)(1), punishes assaults committed by the following means: 'with a deadly weapon or instrument other than a firearm,' or by 'any means of force likely to produce great bodily injury.' One may commit an assault without making actual

physical contact with the person of the victim; because the statute focuses on *use* of a deadly weapon or instrument or, alternatively, on force *likely* to produce great bodily injury, whether the victim in fact suffers any harm is immaterial. [Citation.] . . . [citations] . . . [¶] As used in section 245, subdivision (a)(1), a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury. In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue. [Citations.]" (*Id.* at pp. 1028-1029; see also *In re B.M.* (2018) 6 Cal.5th 528, 532-535 [reaffirming *Aguilar* and its requirement that the object in question be actually used in a manner *likely to produce* death or great bodily injury].)

We find *People v. Brown* (2012) 210 Cal.App.4th 1 instructive. In *Brown*, the defendant challenged his conviction for assault with a deadly weapon arising from his shooting of two men with a BB gun. (*Id.* at p. 7.) Relying on *Aguilar*'s guidance that the deadly nature of the weapon could be shown by any relevant facts, *Brown* rejected defendant's argument that the lack of evidence in the record concerning the type of BB gun, operating speed, and whether the gun used could shoot pellets that would penetrate the body, combined with the minor nature of the victims' injuries mandated reversal of his conviction. (*Id*. at pp. 7-8.) *Brown* concluded that defendant's close proximity to the victims when he fired at them out of the driver's side window resulting in red welts on their feet and back supported his conviction. (*Id*. at p. 8.) "[T]he jury could have reasonably inferred the location and severity of [the victims'] injuries were fortuitous:

10

Had [the victims] not thrown themselves on the ground for cover, they just as easily could have been hit in the face, causing serious injury." (*Ibid.*)

Here, like *Brown*, defendant repeatedly shot the victim at close range with a BB gun. (*People v. Brown, supra*, 210 Cal.App.4th at p. 8.) However, unlike *Brown*, A.D. sustained injuries including the lodging of at least six BB's beneath her skin in areas ranging from her scalp, arm, leg, and foot.[7] Contrary to defendant's suggestions otherwise, these BB's did indeed cause A.D. great bodily harm, including the injuries sustained to A.D.'s leg and foot, which made it difficult for her to walk. The serious nature of these injuries is further demonstrated by the fact that the BB's lodged in such a way that surgery was required to remove them. Moreover, only five of the six could be removed and those five extractions required sutures. Accordingly, we are unconvinced the evidence does not support that the BB gun, as used, was not capable, nor likely of producing great bodily injury. Like the defendant in *Brown*, here, defendant is fortunate that his repeated shooting of A.D. with the BB gun at close range did not result in more grievous injury through, for example, the wounding of A.D.'s face, but such injury is not a prerequisite for this court to sustain defendant's conviction given our conclusion that A.D. did suffer great bodily injury.

2. *The Victim Suffered Great Bodily Injuries*

Defendant attacks both true findings that he inflicted great bodily injury in the commission of counts one and two. Specifically, he argues the injuries sustained by A.D.

---

[7] We note the photographic evidence contained within People's Exhibit No. 1 actually supports that defendant shot A.D. more than six times. However, the record does not disclose whether A.D. was able to remove those BB's herself or whether other, deeper BB's may have still been retained within her tissue. The court highlighted the large number of BB wounds reflected in these pictures in its ultimately ruling on defendant's guilt.

11

when he shot her with a BB gun and hit her face causing a nondisplaced fracture of a facial bone were not severe enough to support the true findings. We disagree.

Section 12022.7 subdivision (e) provides in pertinent part, "Any person who personally inflicts great bodily injury under circumstances involving domestic violence in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three, four, or five years." Subdivision (f) defines "great bodily injury" as "a significant or substantial physical injury." (§ 12022.7, subd. (f).)

Case law has explained that " 'Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate.' " (*People v. Quinonez* (2020) 46 Cal.App.5th 457, 464 (*Quinonez*).) However, such injury need not be " ' "permanent," "prolonged," or "protracted" ' bodily damage. [Citation.]" (*People v. Cross* (2008) 45 Cal.4th 58, 64.) "Proof that a victim's bodily injury is 'great'—that is, significant or substantial within the meaning of section 12022.7—is commonly established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury." (*Id.* at p. 66.)

A wide panoply of physical injuries are included within this definition. For example, "Some physical pain or damage, such as '[a]brasions, lacerations, and bruising can constitute great bodily injury. [Citation.]' (*People v. Jung* (1999) 71 Cal.App.4th 1036, 1042; see *People v. Washington* (2012) 210 Cal.App.4th 1042, 1047-1048; see also, e.g., *People v. Corona* (1989) 213 Cal.App.3d 589, 590 [swollen jaw, bruises to head and neck and sore ribs were sufficient to show 'great bodily injury']; *People v. Sanchez* (1982) 131 Cal.App.3d 718, disapproved on other grounds in *People v. Escobar* (1992) 3 Cal.4th 740, 755 (conc. opn. of Mosk, J.) [evidence of multiple abrasions and lacerations to the victim's back and bruising of the eye and cheek sustained a finding of 'great bodily injury']; *People v. Jaramillo* (1979) 98 Cal.App.3d 830, 836-837 [multiple

12

contusions, swelling and discoloration of the body, and extensive bruises were sufficient to show 'great bodily injury'].)" (*Quinonez, supra*, 46 Cal.App.5th at p. 464.)

Moreover, while every bone fracture does not qualify as serious bodily injury as a matter of law, this does not mean that a bone fracture *cannot* or *should not* qualify as a serious bodily injury. (*People v. Nava* (1989) 207 Cal.App.3d 1490, 1497-1499, abrogated on other grounds as explained in *People v. Clark* (1997) 55 Cal.App.4th 709, 717, fn. 3.) In point of fact, multiple courts have recognized that bone fractures can qualify as serious bodily injuries. (*Ibid.*; *Quinonez, supra*, 46 Cal.App.5th at pp. 464-466 [broken nose]; *People v. Guilford* (2014) 228 Cal.App.4th 651, 661-662 [broken nose]; *People v. Hale* (1999) 75 Cal.App.4th 94, 108 [broken teeth].) Nor is there any requirement that the bone fracture be *displaced* in order to be deemed serious. It is for the trier of fact to decide based on the circumstances of the case whether a particular injury qualifies as serious bodily injury, which we will uphold if there is substantial evidence supporting that determination. (*Quinonez*, at p. 465.)

Here, we find substantial evidence supports the trial court's determination that A.D. sustained great bodily injuries as a result of being shot with the BB gun and as a result of being struck in the face. As we previously noted, A.D. suffered multiple BB wounds where the BB's had to be surgically extracted (including sutures) and where she had suffered both difficulty walking and recurring pain in her hand as a result of her injuries. This is substantial evidence supporting the court's determination. Likewise, A.D. suffered a fracture of a strong facial bone that caused bruising, swelling, and severe pain inhibiting A.D.'s ability to open her mouth and eat for at least two weeks. This is substantial evidence supporting the court's finding. Accordingly, these claims fail.

13

3. *Sufficient Evidence Supports the Victim's Reasonable Fear of Defendant's Threat*

Defendant contends insufficient evidence supports that the victim was in sustained fear as a result of defendant's threat or that any such fear would be reasonable. We disagree.

To establish criminal threats under section 422, the prosecution must prove: (1) the defendant willfully threatened to commit a crime causing death or great bodily injury to the victim; (2) the threat was made with the specific intent that it be taken as a threat—even absent intent to carry out the threat; (3) the threat " 'was, "on its face and under the circumstances . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat" ' "; (4) the threat caused the victim " ' "to be in sustained fear for his or her own safety or for his or her immediate family's safety" ' "; and (5) under the circumstances, the fear was reasonable. (*In re George T.* (2004) 33 Cal.4th 620, 630.)

Here, the People presented testimony that in June 2018 A.D. told authorities that she feared defendant as a result of his threat to "put her six feet under." This threat had occurred months earlier around March 2018 and had frightened her. That A.D. suffered from *sustained fear* as a result of this threat is supported not only by the multiple month window from when defendant had originally made the threat to its report to authorities, but also by her request to neighbors that they call the police if they heard arguing. A request she made because of defendant's threat and because he had broken her phone. That A.D. suffered sustained fear is also supported by her March 2018 statement to authorities that she would not leave the apartment because she feared defendant. In point of fact, the authorities were so concerned for A.D. that they obtained a restraining order to protect her the same June day that she reported the abuse. Fifteen minutes of sustained fear has been held sufficient to support a section 422 conviction. (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1348-1349 [fear continuing up to 15 minutes after one-

14

minute encounter was "sustained" for purposes of § 422].) Accordingly, that the victim still feared defendant months later meets this requirement and constitutes substantial evidence supporting the court's finding.

Nor are we convinced that A.D.'s fear of defendant was unreasonable. On the contrary, the reasonableness of her fear is borne out by the serious nature defendant's threat and the history of horrific abuse she suffered at his hands as we have described herein, including that defendant beat her with closed fists, pots, pans, a shower rod, and had shot her repeatedly with a BB gun.[8] Therefore, we conclude substantial evidence supports this conviction.

B.      *Legislative Changes Including Assembly Bill. No. 124*

On remand, the Supreme Court directed us to "reconsider the cause in light of Assembly Bill No. 124 (Stats. 2021, ch. 695)." After briefing was completed, but before this court issued its unpublished decision affirming the judgment in this matter, the Governor signed Assembly Bill No. 124 and Senate Bill No. 567. Both bills became effective January 1, 2022 (Cal. Const., art. IV, § 8, subd. (c)) and modified the trial court's sentencing discretion under section 1170, subdivision (b). (Stats. 2021, ch. 695, § 5.3 [Assem. Bill No. 124]; Stats. 2021, ch. 731, § 1.3 [Sen. Bill No. 567].) However, because Senate Bill No. 567 was the last bill signed by the Governor and bears the higher chapter number, its amendments to section 1170 prevail over those specified in Assembly Bill No. 124. (Gov. Code, §§ 9510, 9605, subd. (b); *In re Thierry S.* (1977) 19 Cal.3d 727, 738-739.) Among other things, Senate Bill No. 567 requires the trial court to impose the lower term under enumerated mitigating circumstances, such as where an

---

[8] We are unconvinced that we should not consider defendant's abuse in reference to whether A.D. truly feared defendant when he made the threat circa March 2018. By defendant's own admission, he had slapped A.D. in the face in early 2017 and accidentally shot her in December 2017. Accordingly, it is clear to this court that defendant's domestic abuse had preceded the March 2018 threats.

offender's childhood trauma or youth were contributing factors in the offense, unless the court finds the aggravating circumstances outweigh the mitigating circumstances so that imposition of the lower term would be contrary to the interests of justice. (§ 1170, subd. (b)(6)(A)-(B), added by Stats. 2021, ch. 731, § 1.3.)

In his supplemental brief, defendant argues this matter must be remanded for resentencing so the trial court may reconsider its sentencing decisions under the newly legislation. The People concur, and we agree that, in light of the references to defendant's troubled childhood found in the probation report and reporter's transcript of the sentencing hearing, remand is appropriate so that defendant may attempt to take advantage of the changes brought about by the new legislation, including presenting further information that might persuade the trial court to impose the lower term for his principal offense. (See amended § 1170, subd. (b)(6).) The parties agree these changes apply to defendant's case, which is not yet final. (*People v. Vieira* (2005) 35 Cal.4th 264, 306.)

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, [our Supreme Court has] held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' [Citations.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) There is no clear indication what sentencing decisions the trial court would have made if it was bound by the new requirements under Senate Bill No. 567. Thus, we agree with the parties that remand is appropriate so the trial court may resentence defendant in light of these legislative changes. (See *People v. Buycks* (2018) 5 Cal.5th 857, 896, fn. 15.)

16

## III.  DISPOSITION

The judgment of conviction is affirmed.  However, the matter is remanded to the trial court for a full resentencing in light of the legislative changes brought about by Senate Bill No. 567.  Following resentencing, the trial court shall take care to prepare an amended abstract of judgment that reflects the sentences imposed by the trial court, but then stayed pursuant to section 654.  The court shall forward a certified copy of this amended abstract of judgment to the Department of Corrections and Rehabilitation.


                                                                    /s/
                                                            RAYE, P. J.



We concur:



        /s/
BLEASE, J.



        /s/
HOCH, J.


17